---

(No. 11337.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LLOYD BOPP, Plaintiff in Error.

*Opinion filed June 21, 1917.*

1. CRIMINAL LAW—*court should give an attorney appointed for prisoner time to prepare the defense.* An attorney appointed to defend a person charged with crime should not be compelled to act without being allowed a reasonable time in which to understand the case and prepare the defense notwithstanding the fact that he is attorney for another person charged with the same crime and is familiar with his own client's defense.

2. SAME—*attorney appointed to defend a prisoner should have no adverse interest.* The court should not only appoint an attorney of sufficient ability and experience to present the prisoner's defense but also one who has no adverse interest, and it should not appoint an attorney who is employed as counsel for another defendant charged as an accessory after the fact in the same crime, where it is possible that the proving of one defense might disprove the other.

3. SAME—*court should accept statement of attorney that his interest is adverse to that of the prisoner.* An attorney is an officer of the court but he also owes a duty to his client, and where the court appoints him to defend a prisoner, his statement that he is already employed as counsel for another defendant involved in the same crime and that his client's defense is inconsistent with that of the prisoner should be accepted without requiring him to explain the inconsistency.

4. SAME—*the bill of exceptions should show what instructions were given but not marked.* Where none of the instructions for the defendant in a criminal case are marked "given" although some

were given, the bill of exceptions should show that the instructions which should have been given were given.

5. SAME—*when the failure to mark instructions "given" may be prejudicial.* The failure to mark an instruction "given" if it was, in fact, given is ordinarily not such an error as to require a reversal, but where the court marks all the People's instructions "given" and none of the defendant's, although some of them were in fact given, the error may be prejudicial, as the jury might consider those instructions marked "given" as entitled to more weight than those not marked.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOSEPH SABATH, Judge, presiding.

CHARLES C. WILLIAMS, (THOMAS E. SWANSON, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and EDWARD C. FITCH, (JAMES C. O'BRIEN, and GEORGE C. BLISS, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Lloyd Bopp was convicted of murder and sentenced to death, and he has sued out this writ of error to reverse the judgment of conviction.

About two o'clock in the morning of June 14, 1916, Herman Malow and Thure Lindhe, two motorcycle policemen in the village of Oak Park, who were standing near the southwest corner of Cuyler avenue and Washington boulevard, saw two automobiles drive up to the curb on the north side of Washington boulevard, a short distance west of Cuyler avenue, and stop. One of the automobiles was a black Paige car, the other a grey Chalmers. The grey car stopped just outside the black car, toward the center of the street, with its rear about two feet behind the black car. Loud talking was heard from the cars and the two officers went toward them, Malow on foot, pushing his motorcycle,

and Lindhe riding. When Malow was within two or three feet of the grey car shots were fired from the rear of that car and it started to move. Malow was struck by a shot and fell to the pavement. Lindhe on his motorcycle followed the grey car, in which were two men. It was driven' with increasing speed west on Washington boulevard to Scovel avenue, where it turned south to Madison street, where it again turned east. Shots were fired from the car at Lindhe, and as the car approached Parkside avenue, going at the rate of fifty-five or sixty miles an hour, he was wounded by one of the shots and stopped. This grey car had been stolen earlier in the evening from the street in front of an apartment house on Lake Shore drive and was found by the owner the next day at the Maxwell street station. The black car contained two men and a girl. The two men jumped out of the car and ran north along the east side of an apartment building a little west of where the car was standing. The girl went to the corner of Cuyler avenue and Washington boulevard, where she got into a milk wagon and disappeared. An occupant of the apartment building having heard the shots, ran to the window and saw the two men running north past the building. He telephoned to the police that there was a shooting, and, partially dressing himself, went out on the street, which by that time was deserted. He found Malow lying upon the pavement, discovered by his uniform and star that he was a policeman, and went back in the house and telephoned to the police station. He then returned and found Malow still alive. The patrol wagon arrived soon and Malow was put in it but died before reaching the hospital.

The defendant and Frank McErlane were arrested on the night of June 14, at about eleven o'clock. Bopp was indicted for murder and McErlane as an accessory after the fact. On the trial of the defendant Alfred Michelini testified that on the evening of June 13, about ten o'clock, he, together with Bopp and McErlane, was riding in the Paige

car with Walter Ralston. All four were young men about twenty-one or twenty-two years old, who had served terms for various crimes in the State reformatory at Pontiac and who had been recently discharged from that institution, Bopp and McErlane being on parole. He described the course of their wanderings during the evening and their stopping and drinking at various saloons. Ralston was driving the car. They decided to go over on Lake Shore drive and steal another car, and about 11:30 they stole the Chalmers car from in front of 1200 Lake Shore drive. Ralston and Michelini were in the Chalmers car, Ralston driving, and McErlane and Bopp in the Paige car, McErlane driving. After visiting a few saloons they exchanged cars, and about half-past twelve, at the corner of Lincoln and Madison streets, Ralston and Michelini, who were then in the Paige car, picked up Grace Lytle, a girl of the street. The cars then proceeded in company and two or three places were visited in an effort to pick up another girl, a friend of Grace Lytle, but she was not found. As the cars were going west on Washington boulevard, according to Michelini's testimony, Bopp produced a revolver and informed the three in the Paige car that they were under arrest. This was two or three blocks from Cuyler avenue, and he kept the revolver on them until they got about two hundred feet from Cuyler avenue, when he told them to drive to the curb. Before this he had told them to drive to Oak Park police station, but they did not do it. Ralston drove to the curb and the other car drove up alongside. Bopp got off the car with a revolver in his hand and went back to the other machine to look at the license number. He came back and told the occupants of the Paige car to get out of the car, and then a policeman came up. He went back to his car and the car was started to running. McErlane was at the wheel. The policeman made a grab for the car and shots were fired. Bopp was in the car and had the revolver in his hand at the time the shots were fired. After the

shooting the grey car sped away west. Ralston and Michelini jumped out of the black car and went back to the city by the elevated railroad. They went over to Bopp's house on the morning of June 14 and saw Bopp on the street. About five or six o'clock in the evening they went over to Bopp's room and he showed them the revolver. He said it looked pretty bad. The next time Michelini saw Bopp was at the police station. Grace Lytle testified to her meeting with Michelini and Ralston and being taken in the car with them. Her account of the occurrences at the time of the shooting is substantially the same as that of Michelini. She had not met any of the men before, and when she met Bopp at the detective bureau, after his arrest, she was at first unable to identify him. He wore a dark suit at that time, but when the suit was changed for a grey suit she did identify him. Both these witnesses were in the custody of the police at the station in Oak Park from the day of the homicide until the trial of the defendant, and no criminal proceedings have been taken against them.

It was proved that the Chalmers car was stolen as testified by Michelini, and the elevator man at the apartment building from in front of which it was taken identified Bopp as one of the men who stole it. It was proved that Bopp bought a Colt's revolver, 38-caliber, together with a box of cartridges, between two and three o'clock in the afternoon of June 13. This revolver was found on McErlane at the time he and Bopp were arrested, loaded and thrust down inside his trousers. The box of cartridges was in a suitcase which Bopp carried, containing clothing and other articles. Bopp stated at that time that he was on his way to go to see his mother in Lawrenceville, Illinois, of whose sickness he had received word through a letter from his sister.

Bopp's defense was an alibi, shown, in part, by the testimony of the woman at whose house he roomed, at 1711 Monroe street, who testified that he came to the house on the evening of June 13 about eight o'clock and went to his

room soon after and that she did not hear him go out again that night; that there was some defect in the lock of the door and that it was necessary to slam the door to make it stay shut, and that she would have heard him if he had gone out. A man who occupied another room in the house also testified to Bopp's being in the house and going to his room at ten o'clock. The witness' room was close to Bopp's, and he sat up until midnight reading and Bopp did not leave the house during that time. A waiter, who also roomed in the house, testified that he came in late from his work, which he left at one o'clock. When he came in he noticed a light burning in Bopp's room and he went to the door and walked in, but he saw a person lying on the bed, apparently asleep. He turned down the light and went out without disturbing him.

McErlane and Bopp both testified on the trial and denied any knowledge of the transaction and denied all of the occurrences testified to by Grace Lytle and Michelini. They stated that they had never seen Grace Lytle until they saw her at the detective bureau.

When the case was called for trial on September 8 the People announced themselves ready, but the defendant, on being asked by the court if he had an attorney, stated that Mr. Williams was representing McErlane and that Bopp intended engaging him in his case but had not succeeded in raising any money. He suggested that if he was given more time he could raise the money to engage Williams. The State's attorney thereupon suggested to the court that the two chief witnesses for the State were in the custody of the police at Oak Park and being maintained there at considerable expense, and the trial should therefore go ahead even if the court had to appoint an attorney for the defendant. Williams stated to the court that he had not entered his appearance for Bopp, had never been engaged to defend him and knew nothing about his defense; that while he represented McErlane, who was indicted as an accessory after

the fact, the facts as told by McErlane indicated that his
interests were opposed to the interests of Bopp, and in view
of this circumstance and the fact that he was not familiar
with Bopp's defense and had no time in which to familiar-
ize himself with the facts in the case he was not in a posi-
tion to act as counsel for Bopp and did not think it proper
for the court to appoint him to defend Bopp.   He stated
that, realizing that he was an officer of the court, if the
court insisted upon appointing him he would ask for a con-
tinuance for a reasonable time in order to investigate the
case and familiarize himself with the defense.   The State's
attorney expressed his view that if Williams was familiar
with McErlane's case he surely would be familiar with
Bopp's, as they were jointly connected in the murder.   The
court stated that he did not think it would be unfair to
this·defendant to proceed to trial at once, as he was sure
he would be most ably represented by Williams.   Williams
objected, saying he was not ready for trial, and was just
informed by Bopp that there were certain witnesses who
were not there and who were necessary to a proper de-
fense.   At that time he did not know whether or not he
could get them and he had no opportunity to prepare or pre-
sent a proper affidavit for continuance, and the court assured
counsel he need not worry about any witnesses, as the court
would give him time and assist him in any way to get his
witnesses.   The judge said that he had told counsel when
the case was up a week before, that if the man didn't get
money to employ an attorney he would appoint Williams
and that Williams stated at that time he would defend him,
but Williams stated that he had no recollection that the
court remarked at any time, until now, that he intended to
appoint him to defend the man; that he understood the
death penalty would be asked for, and aside from the fact
that the interests of the defendant are antagonistic to the
interests of McErlane, whom he represented, Bopp denied
being at the scene of the crime and claimed that McErlane

might have fired the shot. The court, however, directed counsel to proceed with the case and the trial was immediately begun.

It was an abuse of discretion of the court thus to appoint counsel for the defense without giving him an opportunity for investigation or even to prepare his case. It is not to be assumed that the appointment of counsel by the court for a person charged with crime who is unable to procure counsel for himself is intended to be an empty formality, and that the counsel thus appointed should be compelled to act without being allowed a reasonable time in which to understand the case and prepare the defense. (*North* v. *People,* 139 Ill. 81.) It is the duty of the court not only to appoint counsel of sufficient ability and experience to present the prisoner's defense and protect him from undue oppression, but the court should also appoint counsel who have no interest adverse to the prisoner which would interfere with a fair presentation of his defense, and time and opportunity should also be given to prepare for such defense. It is made the duty of counsel who are appointed to conduct the defense, and the counsel appointed in this case did not undertake to shirk this duty imposed upon him as an officer of the court. He did, however, ask to be excused on the ground that the interest of his client (McErlane) in the trial was antagonistic to that of Bopp. The defenses of these two defendants were not the same. Each was an alibi, but each was dependent upon different testimony from the other. It might well be that testimony tending to exculpate one would tend to inculpate the other. Counsel was not obliged to disclose the facts which had come to his knowl-edge in his relation of attorney and could not properly do so. The facts as to McErlane's alibi were different from those relating to Bopp's alibi. There was no necessary connection between them, but a condition is possible in which the proving of one might disprove the other. On the trial the inconsistencies of the two defenses did not appear, but

McErlane's case was not tried, and we cannot say that there is, in fact, no such inconsistency. The only answer made to the counsel's objection was the State's attorney's statement that he thought that if counsel was familiar with the McErlane case he surely would be familiar with the Bopp case, and the court's statement that he did not think it would be unfair to the defendant to proceed to trial at once. We do not agree with this view. Counsel had not announced that he was ready even in the McErlane case, and familiarity with the one did not necessarily imply familiarity with the other. Even though the evidence touching the homicide were the same as to each defendant, the facts concerning the separate defenses were not. An attorney is an officer of the court, but he also owes a duty to his client which he cannot evade if he would. When the attorney stated to the court that his duty to his client by whom he was retained was inconsistent with the duty which the court sought to impose on him his statement should have been accepted. He should not have been required to disclose the facts showing the inconsistency.

The court also erred in compelling the defendant to go to trial without giving his counsel the opportunity to investigate and prepare his case and to prepare an affidavit for a continuance, and in assuming that preparation of defense in the McErlane case, which was not then called for trial and in which it was assumed he was ready, was sufficient preparation for the trial of Bopp's case.

A number of instructions were requested by the State's attorney and the attorney for the defendant. Those asked by the State's attorney were marked "given" and were read to the jury. None of those asked by the defendant were marked "given" although some of them were read to the jury, and this is assigned for error. When the motion for a new trial was argued, six weeks later, the court marked some of the defendant's instructions "given" and others "refused," saying that he knew pretty well what instructions he

gave and what he refused.  But this action, of course, was immaterial.  The failure to mark an instruction "given," if it was in fact given, is ordinarily not such an error as to require the reversal of a judgment.  In this case the failure was to mark not one instruction but all the instructions for the defendant, while all the instructions for the plaintiff were given and marked "given."  The bill of exceptions does not show which instructions were given to the jury and which refused, but does show that upon the hearing of the motion for a new trial the court marked certain of the instructions given and certain instructions refused.  If the failure to mark the instructions "given" could not be regarded as prejudicial error provided the instructions were in fact given, the bill of exceptions should show that the instructions which should have been given were in fact given to the jury, but the bill of exceptions does not show which instructions were given to the jury, but only that certain instructions were marked "given" long after the trial.  If they were in fact given, the jury would have had before them a series of the instructions marked "given" and another series of instructions not marked, and it might very well be that they would consider those marked "given" as entitled to more weight than those not marked, even if the latter were entitled to consideration at all.

An instruction given on behalf of the People told the jury that if they believed, from the evidence, beyond a reasonable doubt, that the killing of the deceased was the act of the defendant, and also that the defendant did not intend to kill but only to disable the deceased so as to obtain his money or other property on his person, still, even in such case, the act would be murder.  There was no evidence on which to base this instruction.

The judgment of the criminal court will be reversed and the cause remanded for a new trial.

*Reversed and remanded.*