(No. 12176.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LLOYD BOPP, Plaintiff in Error.

*Opinion filed October 21, 1918—Rehearing denied Dec. 4, 1918.*

1. CRIMINAL LAW—*what does not amount to indirect proof of former conviction.* Where a witness in a murder trial testifies that he had known the defendant for several years before the killing, and defendant's counsel, on cross-examination, elicits the fact that the witness was confined in the reformatory at Pontiac during that time, the fact that the State's attorney, on further examination, brought out that the witness became acquainted with the defendant at Pontiac does not·amount to indirect proof of a former conviction of the defendant.

2. SAME—*when revolver, cartridges and sales sheet are properly admitted in evidence.* On the trial of one charged with shooting a policeman, a revolver and cartridges, and a sales sheet showing their sale to the defendant the day before the killing, are admissible to prove his ownership and possession of the same kind of a deadly weapon with which the policeman was killed, even though it is not shown that the revolver and cartridges were of the same caliber as those used in the killing.

3. SAME—*when fact that sales sheet is not signed in defendant's name is not material.* Where the person who sold a revolver and cartridges positively identifies the defendant as the man who bought them and signed the sales sheet, it is not material, so far as the admissibility of the sales sheet in evidence is concerned, that the defendant did not sign his own name thereto.

4. SAME—*objection to letter should point out portions claimed to be irrelevant.* Where a letter written by the defendant while in jail is offered in evidence and it is proven that he wrote the letter, a mere general objection to its admission in evidence does not save the question that certain parts of it were irrelevant and immaterial and should have been excluded by the court.

5. SAME—*jury need not find age of defendant in murder trial where the question is not raised.* In a murder trial it is not necessary for the jury to find the age of the defendant where no question as to his age is raised at any time during the trial.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.

CHARLES C. WILLIAMS, and THOMAS E. SWANSON, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, and JAMES C. O'BRIEN, of counsel,) for the People.

Mr. CHIEF JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Lloyd Bopp, was convicted in the criminal court of Cook county of the murder of Herman Malow, a motorcycle policeman of the village of Oak Park, and was sentenced to death. He has prosecuted this writ of error to reverse the judgment and sentence of the court.

The record evidence shows, without contradiction, that Alfred Michelini and Warren Ralston drove in a black Paige car that had been stolen and met plaintiff in error and Frank McErlane on Madison street, between Paulina street and Ashland avenue, in the city of Chicago, at about the hour of ten o'clock on the night of June 13, 1916. From there they went to plaintiff in error's room at 1711 West Monroe street. After they spent some time at the room they all started out in the Paige car with the intention of stealing another automobile. Ralston had stolen the Paige car. All four were young men about twenty-two years old and all had served terms for various offenses in the State reformatory at Pontiac, plaintiff in error and McErlane being at that time out on parole. Ralston was driving the car, and after visiting and drinking at various saloons they decided to go over on the Lake Shore drive. About 11:30 P. M. they stopped in front of No. 1200 Lake Shore drive, where there was a hotel or rooming house. They there found a gray Chalmers car standing in front of the hotel, the same being the property of Henry B. Conover, a lieutenant in the United States army. Michelini and Ralston

broke the lock on the Chalmers car and got into it and
drove it away, plaintiff in error and McErlane following
in the Paige car. They again visited a number of saloons,
at one of which they exchanged cars, and thereafter plain-
tiff in error and McErlane rode in the Chalmers car while
Michelini and Ralston rode in the Paige car, McErlane and
Ralston all the time doing the driving of the cars. About
twelve o'clock, or later, at the corner of Lincoln and Madi-
son streets, Ralston and Michelini, then riding in the Paige
car, hailed and induced Grace Lytle, a girl of the streets,
to get in their car and ride with them. From that place
they drove to two or three other places in an effort to find
and pick up another girl, a friend of Grace Lytle, but they
did not find her. They finally drove southward through
the city, passing Garfield Park, and later on to Washington
boulevard. While they were riding west on Washington
boulevard plaintiff in error drew a revolver and informed
the three in the Paige car, Michelini, Ralston and Grace
Lytle, that they were under arrest. This was at a place
about two or three blocks from Cuyler avenue, and while
pointing the revolver at them he told them to drive to the
Oak Park police station, but they did not follow his direc-
tions. When they got within about two hundred feet of
Cuyler avenue, the Chalmers car, in which plaintiff in er-
ror and McErlane were riding, began to crowd the Paige
car over to the north curb, and plaintiff in error told the
occupants of the Paige car to drive to the curbing. Plain-
tiff in error and McErlane, after the Lytle girl was picked
up, had driven behind the Paige car, keeping generally a
distance of about half a block from it. Ralston drove to
the curb as directed by plaintiff in error, his car facing
west, and the other car drove up alongside and just south
of it, the distance between the two cars when they stopped
being about eighteen inches. The Chalmers car was stopped
about three or four feet farther east than the other car, the
wind-shield of the Paige car being about even with the front

of the Chalmers car.   Plaintiff in error then got out of the Chalmers car on the south side, walked around the rear of that car and between the two cars, covered the parties in the Paige car with the revolver, and told them to get out,—that they were under arrest.   There was then some loud talking between the parties about Grace Lytle, and some questions were asked by plaintiff in error or McErlane as to the ownership of the Paige car, and Ralston informed them that it was his.   This was between the hours of 1 :30 and 2 o'clock A. M.   Two motorcycle policemen of the village of Oak Park, Herman Malow and Thure Lindhe, dressed in their regular uniform,—blue clothes and white caps,—were at this time standing near the southwest corner of Cuyler avenue and Washington boulevard.   They had seen the two automobiles drive up to the curb on Washington boulevard, a short distance west of Cuyler avenue, and stop.   They heard the loud talking of the occupants of the two cars, and, thinking that there was probably a hold-up taking place there, proceeded at once to where the parties were.   As they were approaching, the plaintiff in error was standing between the cars, and someone remarked, "Here come the police officers."   When Malow was within two or three feet of the Chalmers car and approaching it from the rear the car began to start moving west, and Malow reached for it.   At that moment two or more shots were fired from the rear of the Chalmers car directly at Malow, who was struck by one of the bullets and fell to the pavement, just behind the Chalmers car.   The car at once began moving rapidly west, with one man in front driving it and the other riding in the rear seat.   Officer Lindhe followed it on his motorcycle.   The car was driven with increasing speed west on Washington boulevard to Scovel avenue, where it turned south to Madison street and then turned east.   Several shots were fired at Lindhe by the party riding in the rear seat of the Chalmers car, and Lindhe fired two or three times at that party and tried to get on the side of the car at which

the driver sat so that he could fire at him, but was unable to do so. As the car approached Parkside avenue at the rate of about sixty miles an hour, and when about ten feet from the car, Lindhe was shot through the body by the party firing at him from the rear seat and was not thereafter able to follow the car farther on account of his wound. An occupant of an apartment building near where Malow was shot, on hearing the shots, ran to a window and saw two men running north past the building from the direction of the two cars. He telephoned to the police about the shooting, dressed himself, and on going out found Malow lying upon the pavement. The patrol wagon soon came and Malow was put into it and driven to a hospital but died before reaching there.

Plaintiff in error and Frank McErlane were arrested on the night of June 14, about eleven o'clock, as they were leaving the place where plaintiff in error was rooming, and were afterwards indicted. McErlane, when arrested, had on his person a 38-caliber revolver, and a box of 38-caliber cartridges was found in a suit-case of the plaintiff in error that he then had with him. It was clearly proven that the revolver found on McErlane was the plaintiff in error's revolver, and that he had purchased it and the box of cartridges at a store in Chicago on the afternoon of the day before the killing on the morning of the 14th, and that he purchased the revolver and the cartridges under the name of Phillips, under the pretense that he wanted it to protect his business,—his barber shop. This was proved by the clerk who sold him the revolver and the cartridges, who positively identified him and produced the record of the sale, which he testified was signed by plaintiff in error as P. J. Phillips. The revolver found on McErlane was a Colt's special blue army revolver, 38-caliber, No. 409,451. The sale sheet that plaintiff in error signed as P. J. Phillips showed that the revolver sold him was of that same number and description and that he paid $15.50 for it. The

revolver and the cartridges were put in evidence as exhibits. On the trial Michelini examined the revolver carefully, and said it looked just like one Bopp showed him on the evening of June 13,—the day Bopp bought the gun; that it had a picture of a horse on it, the same as the one in evidence, and that Bopp told him he paid about $15 for it. Michelini testified positively to Bopp being one of the party of four men who stole the Chalmers car and thereafter made the trip to the place of the killing, as above described. Grace Lytle also testified and corroborated Michelini in detail as to all of the events occurring on that ride from the time she joined the men up to the shooting. Both of them testified positively that Bopp and McErlane were riding in the Chalmers car when it stopped at the place of the shooting and as to who drove the two cars; that Bopp got out of the car when it stopped, with revolver in hand, and walked between the cars and pointed the revolver at those in the Paige car, as related; that Bopp was the man who fired all the shots that were fired at Malow there, and that he was in the rear of the car, with McErlane driving, as that car ran west immediately after the shooting. Their testimony further positively agrees that at the time of the firing of the shots Michelini sat in the rear seat of the Paige car and Ralston and Grace Lytle sat in the front seat thereof, and that no one of the four men had a revolver or exhibited one that night except Bopp. Michelini had known Bopp intimately for three or four years before that night, had roomed with him for three or four months immediately before the shooting, and it is undisputed that he was intimately acquainted with him. Officer Lindhe, who saw Bopp at a close distance by street lights, testified that it was his best judgment that Bopp was the man who fired at him from the rear seat of the Chalmers car as he chased it on his motorcycle, but admitted that he was unacquainted with Bopp at that time and could not identify him to a positive certainty as the one who did the shooting. Grace Lytle tes-

285 — 26

tified she had never known Bopp before that night, but her testimony was to the effect that she saw him several times that night at close distances, and in her testimony at the trial she identified Bopp as the man who fired the shots at Malow. William F. Meyer testified that he was working at the apartment house at 1200 Lake Shore drive, operating the passenger elevator there, and that he came out of the house and ordered the four who drove the Paige car up there to move the car from in front of the door. He also testified as to the theft of the Chalmers car, and positively identified Bopp as one of the four men who came in the Paige car. All four of these witnesses emphasized their identification of Bopp by the fact that on that night he wore a light-gray suit, being the only one in that crowd that did wear such a suit. Michelini and the Lytle girl testified positively that he had on a light-gray suit during all the occurrences that took place on that night.

Bopp did not testify at his trial and did not produce or offer the testimony of anyone who was an eye-witness to any of the transactions or occurrences on that night up to and including the shooting. The testimony of Michelini, Grace Lytle and officer Lindhe agrees in every particular as to the identity of the party who fired the shots and as to the point or place where the party was when he fired them, except that Grace Lytle thought that Bopp was on the pavement between the two cars when he fired the shots and close to the rear of the Chalmers car. Officer Lindhe testified that the shots were fired by a party in the rear seat of the Chalmers car, and that they were fired through the back part of the car, straight towards officer Malow. Michelini agrees with him, and states that just before Bopp fired the shots he jumped from the pavement onto the running-board and then into the rear of the car, and that he fired from a standing or stooping position. Grace Lytle was evidently mistaken as to just where Bopp was at the time he fired the shots, as her testimony shows that she was in the front

part of the Paige car and was not looking directly in the direction of the shots at the time they were being fired.

From the evidence there can be no doubt that Bopp was the man who killed officer Malow. No excuse or justification whatever was offered or appears in the record for the killing. Not one word was spoken by the officers or by Bopp at and just before the time the shots were fired. The jury were clearly warranted in the conclusion that the murder was committed by Bopp for the purpose of preventing his arrest and identification as the party in possession of the stolen Chalmers car. While the top of the Chalmers car was up and may have somewhat obscured the features of Bopp from officer Lindhe at the time of the shooting, yet the top of the Paige car was down and its occupants were only a few feet from Bopp when the shots were fired, and all the circumstances show that Michelini and Grace Lytle could not reasonably be mistaken as to who fired those shots, as they knew exactly the location of all three of the other men composing their party. There was no one else in that immediate vicinity except the party of five in the automobiles and the two officers.

Very damaging evidence was also introduced against plaintiff in error by the State, consisting of letters written by him while in jail with a view to fabricating and suppressing testimony against him. He wrote a letter to Nellie Inns, a witness who testified for the prosecution and also for Bopp, who had become infatuated with him while he was in jail and who had not known him before he was arrested, in which he asked her to remember that "G." (evidently meaning Grace Lytle) was present at a time when a certain girl mentioned was also present, (which was untrue,) and suggested that they must get together. In a letter to Dave Gammell he asked him to go to the house where Michelini was staying and represent himself to be an officer, sent there by the State's attorney's office; that Gammell must be sure that Elmer Bell, to whom Michelini was

paroled, would not be present when he went to the house. The letter contained, among other directions to Gammell, the following: "Mickey, I know I will go to trial, and if that dago goes back up there hawking on me it will sure mean another hanging for me. Mickey, if you get him just hold him in a room and come to see me." Gammell was not an officer, and the evident purpose of the letter was to get and hold Michelini as a prisoner or to spirit him away or induce him to testify falsely. By the words, "it will sure mean another hanging for me," he evidently had in mind his previous conviction in this case, which was set aside by this court. (*People* v. *Bopp,* 279 Ill. 184.) Michelini also testified that he saw Bopp the next morning after the killing and showed him a newspaper containing an account of the shooting of Malow, and after looking at the paper Bopp remarked that it "looked mighty bad."

Immediately after Bopp fired the shots at Malow, Ralston and Michelini jumped out of the Paige car, ran up an alley, northward, in the near vicinity of the shooting, and passed directly under the window of Charles P. Bradley and only a few feet from him. Bradley testified that he heard one of the two say, "Jesus! You have killed him!" Plaintiff in error points to this remark as conclusive evidence that one of those two running north did the shooting. It is the only testimony of any positive fact that occurred near the shooting tending in any way to support Bopp's contention that he did not fire the fatal shot. Michelini in his testimony denied making the remark. The evidence conclusively establishes the fact that neither of those two persons knew that officer Malow was killed, or even wounded, until the next day, as they ran away immediately when the firing began, according to the testimony of Michelini, Grace Lytle and Bradley. If any such remark was made it may have been misunderstood, or if made by Ralston, who did not testify, he might have been mistaken as to who fired the shot. In any event, it is not sufficient to overcome the

positive testimony of the three witnesses as· to who fired
the shots and the identical place from which he fired them.

The main defense relied upon by plaintiff in error was
that of an alibi.  Sarah Bosma, with whom plaintiff in er-
ror was boarding at the time in question, testified that she
saw him come in the front door about eight o'clock on the
evening before the shooting with a light-gray suit of clothes
hanging over his arm; that at about 9:30 he asked her to
play a piece on the victrola; that thereafter he went through
the dining room to the bath room and came back with a
pitcher of water; that to the best of her judgment he re-
tired at ten o'clock, and that she saw him next morning in
his room at fifteen minutes to seven o'clock.  ·She also tes-
tified that a gentleman came to the house and asked for
Bopp, and that she heard his name was Frank McErlane;
that a man they called the "dago" was also in his room that
evening; that she heard a man in Bopp's room, and that a
party in the house saw him and told her it was the dago.
The dago was evidently Michelini, as he testified positively
that he and McErlane were both there on the evening be-
fore the shooting.

C. A. Murphy, also a boarder at the Bosma home, for-
merly a physician but at the time in question connected with
the Oriental Candy Company, testified that he saw Bopp,
all told, about three times in the five or six weeks he was a
roomer there; that on the night in question he heard Bopp
call out to Mrs. Bosma, about 9:30 o'clock, to play a cer-
tain piece on the victrola; that he saw him go to his room
with a pitcher of water, and that the last noise he heard in
Bopp's room was at 10:20 or 10:30; that Bopp had some
people in his room, who made some noise slamming the
door as they left; that he did not see Bopp after those peo-
ple went out but heard him in his room making the noise
that a person would ordinarily make in walking; that he
did not know whether or not Bopp was in his room at ten
o'clock and did not know if he was in his room at 1:30

the next morning but that he did not see Bopp go out after his company left his room.

Paul Tewel, another boarder at the Bosma home, testified that he quit work at one o'clock on the morning of the shooting; that he walked over to Paulina and Monroe streets and got a paper and saw an account of the killing, and got to his boarding house about two o'clock; that he went into Bopp's room, where he saw a light burning, thinking that Bopp was up; that he saw that he was asleep, turned the light out and shut the door; that he read about the shooting in Oak Park in the newspaper between 1:30 and 2 o'clock in the morning.

The first two of the alibi witnesses corroborated Michelini's testimony to the effect that he and McErlane and Ralston went with Bopp to his room after Ralston and Michelini had met Bopp and McErlane with the Paige car and talked together in his room for several minutes before starting out on their raid to steal another automobile, and that Bopp remained in his room, getting ready to go, a few minutes after Michelini and McErlane had gone down to the Paige car. Their testimony is far from establishing a satisfactory alibi for Bopp, and is not inconsistent with the idea that he left his room stealthily about eleven o'clock to go with his confederates. Mrs. Bosma's testimony also emphasizes the fact of Bopp's being clad in a light-gray suit. The jury were warranted in disregarding the testimony of Tewel, either upon the ground that his testimony was a fabrication or that he arrived at Bopp's room much later than two o'clock on that morning. It is hardly possible that he could have read a newspaper account of the killing at the time he testified he did, which was at or before the time it actually took place.

Plaintiff in error insists that the judgment must be reversed because the State's attorney was permitted to prove in an indirect way that Bopp had been convicted of an offense and sentenced to the reformatory at Pontiac. This

contention is without merit. In the cross-examination of
Michelini, who had testified in chief that he had known Bopp
two or more years prior to the killing, Bopp's counsel by
his interrogatories caused him to admit that he (Michelini)
had been sent to the reformatory for an offense and while
there learned the printing trade, and that he remained there
about four years. That time included the entire time of
Michelini's acquaintance with Bopp, and in substance was
a refutation of the fact that he could have known Bopp in
that time unless he became acquainted with him while at
Pontiac. For the apparent purpose of clearing up the mat-
ter, the State's attorney, on re-direct examination, elicited
the further information from Michelini that he became ac-
quainted with Bopp four years or more prior to March,
1916, in Pontiac. Bopp's counsel then objected to this tes-
timony on the ground that it was not the proper way to
show a previous conviction,—that the record is the best evi-
dence thereof,—not disclosing by the objection whether he
meant the conviction of Bopp or of Michelini. There was
no suggestion by the State that Bopp had been convicted
at any time or was a prisoner at Pontiac other than as just
shown, and but for the objection made by Bopp's counsel
the jury would doubtless not have entertained any idea
that such a conviction was sought to be shown. The proof
that Michelini became acquainted with Bopp in Pontiac
was properly admitted because of the fact that the cross-
examination of Michelini showed that during the previous
years he had known Bopp he was in Pontiac in prison.

The objection that the revolver in question, the 38-caliber
bullet, and the sale sheet signed by Bopp as P. J. Phillips
showing who purchased the revolver, were improperly ad-
mitted in evidence, is not tenable. They were not offered
in evidence because identified as the revolver and bullet with
which Malow was killed, but for the purpose of showing
that Bopp was the owner and possessor of the revolver and
cartridges at the time of the killing, and the sale sheet

completely identified the revolver as the one purchased and owned by Bopp. That he was the owner and possessor of such a revolver and cartridges and had purchased them on the afternoon before the killing was not evidence that it was the same revolver with which Malow was shot, but that Bopp was the owner and possessor of the same kind of deadly weapon with which Malow was killed. It was not necessary, therefore, to prove that Malow was shot and killed with a 38-caliber revolver or that the bullet taken from his body was a 38-caliber bullet, although such proof would have been a further circumstance against plaintiff in error. The objection to the admission of the sale sheet because the signature thereto was not proven to be that of Bopp is wholly without merit, as the evidence of the salesman was very positive that Bopp signed it and signed his name as P. J. Phillips.

The claim of plaintiff in error that the letter introduced in evidence written by him to Dave Gammell should have been excluded from the jury by the court on its motion because it contained some matters that were immaterial and therefore prejudicial to him is not well made, because the objection was to the whole letter and not to any specific part. It was proven to have been written by plaintiff in error, and as the objection to its introduction was general, without specifically pointing out any portions of the letter that were objectionable or irrelevant, the motion to exclude it was properly overruled. *People* v. *Walczniak,* 273 Ill. 76.

. The court refused to give an instruction telling the jury, in substance, that the defendant was presumed to be innocent through every stage of the trial. If it be conceded that the instruction was a proper one, it was not error to refuse it because the court gave two other instructions fully covering the question of the presumption of innocence.

No question as to the age of plaintiff in error was raised at any time during the trial. It was not necessary to a legal conviction, therefore, that the jury should find the age of

the defendant by its verdict. It is not necessary to find the age of the defendant in a criminal case at any time unless his age is put in question, and it appears from the record in this case that plaintiff in error is between the ages of sixteen and twenty-six. *Sullivan* v. *People,* 156 Ill. 94; *Schultz* v. *People,* 260 id. 35; Hurd's Stat. 1916, chap. 118, sec. 10.

It is also contended by plaintiff in error that the court erred in admitting the record showing the time the employees of Libby, McNeill & Libby worked, or the page thereof showing that Nellie Inns worked ten hours for that company on the 24th of July, 1917, in contradiction of her testimony that she was at the county jail with Bopp and Grace Lytle on that day and heard Grace tell Bopp that what she had testified to against him on the former trial was untrue, etc. The objection was made on the trial that the witness who testified regarding the record had no personal knowledge of it except that gained from writings of and conversations with subordinates, and that the record did not show the hours Nellie Inns worked on that day. The witness testified that he was time-keeper for Libby, McNeill & Libby; that the entries in question were entered in the handwriting of one Swanson, under his personal supervision and direction, and that the working hours at Libby's was from 7 A. M. until 5:30 P. M. on that date, and that Nellie Inns was paid by said firm for ten hours' work on that day. The record was not subject to the objection urged against it and the objection was therefore properly overruled. Besides, Nellie Inns fixed the date that she was at the jail at about July 24, 1917, and not more definitely. She was also thoroughly impeached by her own testimony, wherein she admitted that she had agreed with Bopp to give testimony in his behalf that was untrue, and she was first a witness for the prosecution and later a witness for plaintiff in error.

There is one other set of circumstances urged by plaintiff in error as proof that he could not have fired the fatal

shot that killed officer Malow, namely, that Malow was more than five feet and ten inches tall, that Bopp, as alleged, was on the ground in a stooping position when he fired the shots, and that the evidence at the trial showed that the fatal bullet entered the body in the front chest wall, to the right of and just below the nipple, took a downward course and was found imbedded in the tissues of the pelvis. This argument is based upon the fact that the testimony of both Michelini and Grace Lytle was to the effect that Bopp was on the ground, in a stooping position, when he fired the fatal shot, and that we must assume that Bopp's height was only an average height although the record does not disclose the same. The testimony of Michelini and of officer Lindhe shows that Bopp was either on the north running-board of the Chalmers car or was standing in the rear portion of it, shooting out of the rear of the car during all the time he was shooting. The course of the ball that inflicted the fatal injury would depend entirely upon the distance the deceased was away from the revolver when it was fired and how it was fired by Bopp,—with an upraised hand or otherwise,—and the erect or stooping position of the deceased at the exact moment of the firing, none of which facts are definitely shown by the record. The record does not warrant this court in theorizing or speculating as to how the ball happened to strike the body and take a downward course, particularly where the minute details or facts that would cause the ball to take such a course were not in evidence and not even obtainable. The evidence in the record does not warrant any other conclusion except that reached by the jury, and that plaintiff in error was proven guilty of the charge of murder clearly and completely and beyond all reasonable doubt.

There were no reversible errors committed by the court.

The judgment is affirmed, and the clerk of this court is directed to enter an order fixing the period between nine o'clock in the forenoon and four o'clock in the afternoon

of the sixth day of December, 1918, as the time when the original death sentence entered in the criminal court of Cook county shall be executed. A certified copy of such order shall be furnished to the sheriff of Cook county.

*Judgment affirmed.*