[Crim. No. 7056. Second Dist., Div. One. Sept. 16, 1960.]

THE PEOPLE, Respondent, v. VERNON CHARLES KER-
FOOT, Defendant; WALTER RAYMOND DEMES,
Appellant.

Harold J. Ackerman, under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, and S. Clark Moore, Deputy Attorney General, for Respondent.

FOURT, Acting P. J.—This is an appeal from a judgment wherein appellant Demes was convicted of murdering Leland Browse and of assault with a deadly weapon with intent to murder Adam Safian.

In an information filed in Los Angeles County on February 18, 1959, the defendants were charged in Count I with violating the provisions of section 187, Penal Code (murder) and in Count II with violating the provisions of section 217, Penal Code (assault with a deadly weapon with intent to commit murder). Kerfoot, the codefendant, was charged with prior convictions of burglary in 1936, rape in 1940 and burglary in 1946. Demes, the appellant, was charged with prior convictions of robbery in 1939 in Los Angeles County and robbery in 1947 in San Francisco with terms served in the state prison for each of such offenses. Each defendant pleaded not guilty.

At the first trial it was claimed and represented to the judge that there was a conflict of interest between the defendants and thereupon the court appointed Andrew R. Edwards, a private practicing attorney, to represent Demes and Thomas LeSage, a private practicing attorney, to represent Kerfoot. The first trial was commenced before a jury on June 25, 1959. Before the start of the trial and outside

the hearing of the prospective jurors the defendants admitted the prior convictions as charged in the information.

The minutes of June 8, 1959, with reference to the first trial recite in part as follows:

"Deputy district attorney W. E. McGinley and defendants with counsel, deputy public defender R. S. Buckley present. At the request of each defendant and due to a conflict of interest attorney Thomas LeSage is appointed, pursuant to Section 987(a) Penal Code, as to defendant Kerfoot and attorney Andrew R. Edwards is appointed, pursuant to Section 987(a) Penal Code as to defendant Demes. On motion of each defendant, trial is continued to June 22, 1959 at 9:00 a.m. Time waived. Defendant is remanded."

A jury was completed and sworn in to try the case (first trial) on July 1, 1959. Testimony was taken for several days and on Friday, July 24, 1959, the jury started to deliberate. They were locked up over the weekend and started deliberations again on Monday, July 27, and continued through Monday, Tuesday, Wednesday, Thursday, Friday and Saturday. On Saturday, August 1, 1959, at about 12:40 p.m. the jury stated that it could not arrive at a verdict. The jury stood seven for not guilty and five for guilty. The case was set for further proceedings on August 3, 1959.

When the case was called on calendar on August 3, 1959, Mr. LeSage moved for a dismissal of the case against Kerfoot upon the ground that the jury stood seven for acquittal and five for guilty. Mr. Edwards made the same motion on behalf of Demes. The motions were denied. Mr. LeSage then made a motion to be relieved as counsel for Kerfoot, stating:

"MR. LeSAGE: At this time, if your Honor please, I would like to make a motion to be relieved as counsel in view of the fact that the trial took approximately two months of my time and my other trial commitments, *my physical condition is such I don't believe, if your Honor please, I could at this time undertake the responsibility of again representing Mr. Kerfoot.* I respectfully ask the Court to be relieved as counsel at this time." (Emphasis added.) The court then immediately said:

"THE COURT: Very well. Upon request of the defense counsel for Mr. Kerfoot the Court will relieve you from the responsibility of again representing Mr. Kerfoot."

Mr. Edwards then said:

"MR. EDWARDS: As to the defendant Walter Demes, if your Honor please, I should like to make a motion to be

relieved. From June 8th when I was appointed in this case almost all of my time has been devoted to this case. I too have had matters back up on me and my present schedule is such, *plus the emotional and physical exhaustion of this matter that I feel I couldn't do a proper job in going further with this* and I request that I also be relieved." (Emphasis added.)

The court immediately said:

"THE COURT: Very well, the Court will grant your motion to be relieved likewise, Mr. Edwards."

The original record indicates that Mr. LeSage petitioned the court for an allowance of $9,150 for attorney's fees for the 18 days of trial, research and attendance from time to time during the jury deliberations, plus $587.17 for costs advanced. The court awarded Mr. LeSage $6,000 in attorney's fees plus the costs advanced of $587.17. Mr. Edwards petitioned for an allowance of $8,000 for fees and for $289.44 for costs advanced. The court awarded Mr. Edwards $5,000 as attorney's fees and $289.44 in costs advanced.

Immediately after relieving Mr. LeSage and Mr. Edwards of their duties as attorneys for the respective defendants, the judge related with reference to the conflict of interest matter that prior to the first trial he had talked with Mr. Buckley of the public defender's office and Buckley had said to him that in the conversation between the defendants Kerfoot and Demes and conversations that he had with an investigator from his office that he felt there was a conflict of interest between the two. By reason of that conflict he felt that the public defender's office should not represent either one of the defendants and for that reason, by reason of that potential conflict of interest the court allowed Mr. Buckley to withdraw from the case and the court appointed LeSage and Edwards as heretofore set forth. The judge then recited that he had heard the testimony in the first trial and that there was no conflict of interest between the defendants and that one attorney could represent both defendants. It was then stated by the judge that he had talked with Mr. Cuff, the public defender, and that Cuff had consented to allow Mr. Littlefield of that office to represent the defendants at the next trial.

Demes stated that pursuant to section 987a, Penal Code, "we are entitled to private counsel" and the court replied that it was not going to appoint private counsel. Demes during this session of court repeatedly stated that he was entitled to independent counsel and that there was a conflict of in-

terest. The judge replied to Demes that he was not going to appoint private or independent counsel for Demes and Demes, under the circumstances, then said "I accept Mr. Littlefield." Kerfoot stated in effect at that time that he would not have the public defender defend him. The judge then appointed Mr. Littlefield to represent Demes. The judge told Kerfoot that he would take Littlefield or be without counsel—one or the other. Littlefield explained that he was then engaged in a trial and that the matter he was then engaged in would take six weeks or so to complete and he asked that the case involving the appellant go over to September 14, 1959, for trial. The case was then set for trial on September 14, 1959.

The deputy district attorney asked that the former attorneys turn over to Littlefield and Kerfoot the transcripts and Edwards answered that he would turn over the transcripts in his possession, to Littlefield for Demes. Just as the proceedings were concluded Kerfoot stated that he would accept Littlefield and the court appointed Littlefield to represent Kerfoot also in the case.

On September 1, 1959, the cause was advanced on the calendar for the purpose of making a motion for a continuance of the trial date. Littlefield related that since the date of his appointment he had been engaged in trial and that he had not received copies of the transcripts. He stated further that LeSage had written that he had delivered the transcripts to Kerfoot personally—that Edwards was on vacation and his office had said that the transcripts would be available if somebody would come out to pick them up—further that even if he had had the transcripts he could not have read them because of his engagement in trial. Littlefield further said in speaking for the continuance that he understood there were some out-of-state witnesses who would have to be brought to California at county expense—that he had had no time to prepare and wanted a two- or three-week continuance. Littlefield further stated that if a continuance was not granted the defendants would necessarily be deprived of the right to counsel guaranteed to them by the Constitution of the United States and that of California. Littlefield stated also that the defendants had talked to him that morning and they desired to make certain motions which would relieve the public defender of representing them in connection with the cause. Kerfoot then stated, "I wish to dismiss the Public Defender." The judge attempted to explain the seriousness of the situation and that the prosecution was asking the death pen-

alty—that there were many technicalities and further said, ". . . *You fully realize the fact that you are not qualified to properly conduct the defense of your trial.* . . ." (Emphasis added.) The judge told Kerfoot that he could not possibly adequately represent himself and further said that if Kerfoot discharged the public defender, ". . . *the Court is not going to appoint private counsel to represent you.*" (Emphasis added.) Kerfoot announced, "Then I will sit mute during the trial." The judge then asked Demes if he wished to retain the public defender to represent him and Demes answered, "No, I don't. . . ." When asked if he wanted to make a motion to discharge the public defender, Demes stated that he wanted a "writ of prohibition," that there was a conflict of interest and further that he wanted a change of venue. The court denied the motions for a change of venue, "separation of defendants for trial" and "continuance for purpose of filing a writ of prohibition" and set the case down for trial for the date originally scheduled, namely September 14, 1959, and then *relieved the public defender of representing the defendants* and ordered that all documents in possession of the public defender go to the defendants. Kerfoot stated that he had received a copy of the transcript.

Prior to the proceedings with reference to the selection of the jury at the second trial on the morning of Monday, September 14, 1959, the case was called and the deputy district attorney answered ready for trial. The judge asked the defendants if they were ready for trial and Demes replied, "No. I haven't even got a transcript. How do you expect us to go to trial in this Court. You ordered transcripts in my case. I haven't even got the transcripts in my case." The judge replied, "What do you mean transcripts?" and Demes answered in effect that transcripts were ordered and he had not received one. Littlefield was in court (apparently upon another matter) and stated that Edwards, who had been the attorney for Demes, had been on vacation and had not returned until the week before; that the transcripts delivered to Demes were not complete and that that morning he (Littlefield) had discovered five volumes of the transcript, having had "a faint recollection of seeing them somewhere." (Namely volume 4 for the proceedings of Wednesday, July 8; volume 5 for Thursday, July 9; volume 8 for Wednesday, July 15; volume 10 for Monday, July 20; and volume 11 for Tuesday, July 21.) Littlefield stated that he had found the transcripts that morning in a file in Department 102. Little-

field then stated that the five volumes could be delivered to Demes at that time. Demes advised that there were still other volumes missing and that the public defender's office never did have all of the transcripts. Demes then called the court's attention to certain specific transcriptions which were missing and told of the volumes which he had. It developed that apparently the deputy district attorney had talked with Edwards on Friday afternoon (presumably September 11, 1959), and Edwards had said that he had left with Demes all of the transcripts with the exception of the volumes he could not locate. Demes claimed that Edwards never delivered the transcripts to him and that he got the volumes he did have from the jail officer in the attorney's room of the jail. The judge then asked Demes if he had now received all of the transcripts of the testimony given at the prior trial and Demes indicated that he did not know whether he was possessed of such. The judge then asked defendants if they were ready for trial. Kerfoot and the judge engaged in a discussion about Kerfoot's not being represented by counsel. The judge told Kerfoot that he could be represented with an independent attorney if he had the money to pay for it and not otherwise. Littlefield then stated that he would be willing to represent both of the defendants in the case, however that he had just completed a protracted case on the previous Friday, that he had had no opportunity to prepare; that *there was one possible conflict of interest between the defendants,* that he hadn't read the transcripts, that the prosecution was asking for the death penalty, that Kerfoot had told him that the prosecution contended that he had committed the actual murder and that Demes was supposed to have driven the get-away car—that in any argument on penalty one attorney would be at a severe disadvantage if he had to argue penalty as to both defendants, that under some theories Demes could be deemed less culpable. Littlefield stated that he *would represent either or both of them* but if he did so he would have to have a continuance to prepare for trial. The deputy district attorney stated that he felt there was no conflict of interest. The judge indicated that if the defendants were found guilty of murder in the first degree he could then perhaps appoint another attorney for Demes at the penalty trial. The judge inquired of Kerfoot as to whether he wanted the public defender to represent him and Kerfoot replied, "No, sir." The judge then said, "You will not accept the services of Mr. Littlefield who the Court has heretofore ap-

pointed for you?'' Kerfoot answered, ''That is right. I don't want no Public Defender, I want private counsel.'' The judge apparently did not remember that he had theretofore relieved the public defender of representing the defendants. Demes was then asked if such was his feeling too and he said it was and further said, *''There is a conflict of interest. So far as I'm concerned I want separate counsel from Mr. Kerfoot.''*

Littlefield then said as an ''officer of the Court'' that he *did not believe Demes could possibly be ready for trial on that date,* pointing out that he had some out-of-state witnesses and that he had been unable to get a court order to secure the attendance of those particular witnesses. Littlefield also told the court that he had done nothing at all in preparation for the trial—that he had consulted with defendants only once and then only to tell them he was engaged in another trial and could not do anything on their matter until he was through with the other case. Demes called the judge's attention to the fact that he, the judge, also knew that Littlefield was engaged in another trial for the previous six weeks. The deputy district attorney then accused the defendants of wanting ''to stall this thing and delay it as much as possible'' and thereupon announced that he was ready for trial. Kerfoot pointed out that before the previous trial and after the conflict of interest between the defendants was pointed out to the judge the defendants went right along with the newly appointed counsel, that the delay, if any, was not their fault, that the public defender had not contacted them about their case and had done no work whatsoever on it and further that they, the defendants, had been in jail seven months and wanted to get to trial but that he, Kerfoot, wanted a lawyer to represent him.

The judge then read to the defendants section 987a of the Penal Code and said that the court was without authority to appoint private counsel to represent them at the trial because Mr. Littlefield had not refused to represent the defendants but that he was ready to represent them. The court urged both of the defendants to accept the services of Littlefield in the trial of the case and said that if they did so accept such services the court would grant a reasonable continuance of the trial to the end that Littlefield could fully consult with the defendants and be fully prepared for trial; that if his services were not accepted then the only thing the court could do would be to request of Littlefield that he assist them

in the subpoenaing of witnesses, and added, *"the matter will go to trial this morning."* (Emphasis added.) The judge told Demes, "There is no conflict of interest between the two of you defendants that would warrant the Court in making any assignment of private counsel." The judge made it crystal clear that under no circumstances was he going to appoint private counsel, nor was he going to appoint separate or independent counsel for the defendants or either of them. Demes stated repeatedly, as he had stated many times before that he wanted separate counsel, that there were conflicting issues and conflicting interests.

The judge then called upon Mr. Edwards who happened to be in the courtroom (not with reference to this case) to express whether in his legal opinion there was any possibility of any conflict between the two defendants. Instead of calling attention to the confidential relationship which existed between himself and Demes and stating that he was not at liberty to express any views about his former client's defense, Edwards answered the question of the court by in effect giving no answer at all. He said, "Your Honor, I could not say that in my opinion there was a technical conflict as developed by the evidence. The question as to whether or not these men could be best represented by two lawyers is something apart from that apparently *not* encompassed in any provision of the code. As to a technical conflict, *I could not say*, since you asked me that, *I could say*, that there developed in the course of this proceeding a technical conflict of interest between them, no, sir, I cannot say that." (Emphasis added.)

The judge then told the defendants that if they had any witnesses to be subpoenaed to give the names to the public defender and *we* will see that they are subpoenaed. The defendants advised the judge that the witnesses were out of state and the defendants were then told to give the names to the public defender. Demes then moved for a separate trial which was denied. The judge told the defendants the case was going to trial, that he was calling in prospective jurors forthwith and that they would have certain peremptory challenges and challenges for cause. When Demes was asked if he had any witnesses to subpoena at that time he answered, "I have nothing to say. It don't matter." At the afternoon session just prior to swearing in the jury panel Demes again advised the judge, *"I still want a lawyer, too."* (Emphasis added.)

The selection of a jury went forward and on Tuesday, September 15, a jury of 12 was completed. Two alternates were to be selected on the following Monday, September 21, 1959. Due to the absence of the judge on Monday, September 21, 1959, the case was continued to Wednesday, September 23, 1959. Evidence was heard on September 23, 24 and 28, 1959. On the 28th of September at about 2:30 p. m. the cause was submitted to the jury. At about 11 a. m. on September 29, the jury returned to court with verdicts of guilty as to both defendants on both counts and found the murder to be in the first degree.

A résumé of a part of the evidence produced by the prosecution in the second trial is as follows:

The deputy district attorney called as his first witness a correctional officer of Folsom Prison who had been employed as such since March of 1956. He testified that he had seen the defendant, Kerfoot, in Folsom Prison in March of 1956, and the defendant, Demes, in about June of *1947*. He was then asked, "And would you tell the jury the *last* date of discharge of the defendant Demes from Folsom Prison" and he answered, "10-13-56" or October 13, 1956. He was asked, "And the defendant Kerfoot will you tell the jury when he was *last* released from Folsom Prison" and he answered "10-2-58" or October 2, 1958. The question was then asked if he had ever seen the two defendants talking to each other "*there in State Prison*" and his answer was that he had seen them together, or as stated by the deputy district attorney, "talking with one another as well as with other prisoners." (Emphasis added.)

On January 19, 1959, a sporting goods store in Reno, Nevada, was burglarized and several revolvers or pistols and some other items were stolen therefrom. Among the guns taken was a .22 calibre Smith and Wesson, Serial No. 26,780 and a .38 calibre Smith and Wesson, Serial No. 126,586. There was also a green jacket missing.

On January 20, 1959, shortly after 6 p. m., two men got out of a car and went into a café in north Las Vegas, Nevada. The men resembled the defendants and the car resembled a car which apparently was used in the murder episode. At the café Kerfoot drew out a revolver and demanded money and was handed about $60 by the proprietor. Demes told Kerfoot to put the gun away and "Let's get out of here."

On January 23, 1959, at about 6:30 a. m. in a market in Phoenix, Arizona, Kerfoot pulled a gun and held up the clerk

of the store. Demes supposedly stood guard at the door of the store. About $272 was secured in the robbery.

On January 25, 1959, a barmaid saw the defendants in a bar in Hollywood that evening. She left the bar about 1:20 a. m. (January 26) and the defendants preceded her by about half an hour to 45 minutes. While at the bar Kerfoot showed a gun to the bartender and asked if he could use it and the bartender answered "No."

Nathan Fram and Leland Browse were working in Fram's liquor store on Hollywood Boulevard at about 1:20 a. m. or 1:25 a. m. on January 26, 1959. Kerfoot entered the store with a gun in his hand and Fram told him to put the gun away and to get out. Kerfoot went towards Browse and demanded the money. Fram walked behind the counter and saw Adam Safian, a policeman, starting to enter the store. Browse called to Safian, "Watch this man, he's got a gun!" Kerfoot turned around and started shooting. Browse ran out of the store and Fram heard guns firing. Safian was hit twice and fell backwards. Safian saw that the gun Kerfoot had was a .22 or .25 calibre. Browse was shot and fell down and Kerfoot ran around the corner. Safian fired several shots at Kerfoot as he ran. Kerfoot got into a 1954 or 1955 Pontiac automobile on the passenger's side. The car started moving before the car door closed. Two shots were fired at the car by Safian.

At about 10 or 15 minutes before 2 a. m. the defendants returned to the bar where they had previously been and were served a drink. They stayed at the bar until between 2:15 and 2:30 a. m. at which time they walked north to Hollywood Boulevard with the bartender.

At about 2:30 a. m. on January 26, 1959, Officer Kjorlien saw a Pontiac automobile parked near 6709 Selma Street. He noticed a crease on the car over the rear window which appeared to have been made by a bullet. Officer Seela arrived and opened the trunk of the car and found therein a .38 calibre revolver. The car was locked up again. At about 3:55 a. m. the defendants were walking in a westerly direction on Selma Avenue in the general direction of the Pontiac car. One of the defendants said, "There it is." When they reached the parked automobile they kept on walking and turned north on Highland Avenue. The officers followed and saw the defendants standing back of some bushes. The defendants were ordered by the police (who identified themselves as such) to come out with their hands in the air. A

second command was given and Kerfoot came to the sidewalk and after a further command Demes came out. The defendants were handcuffed and taken to the vicinity of the parked Pontiac car. Some keys were removed from Demes' pocket which unlocked the doors and the ignition of the Pontiac car. The defendants were taken to the police station. Keys were taken from Kerfoot's pocket which also unfastened the car locks. Two live .22 calibre shells were also found in Kerfoot's pockets.

An autopsy was performed on Browse and it was found that he died from a gunshot wound in the chest.

Officer Hancock found a pair of sunglasses in the Pontiac car which contained a thumb print which matched a thumb print of Kerfoot. On January 28, 1959, at the rear of 6709 Selma Street, Hancock found a .22 calibre revolver lying under some asparagus fern bushes. Near the gun were some heel prints. A plaster cast of one of the heel prints was taken and later compared with the heel of one of Kerfoot's shoes. A most favorable comparison was noted. The trousers of Kerfoot contained some particles of asparagus fern leaves.

There was a trial on the issue of the penalty in the murder case with the same jury hearing the matter and it was determined that the penalty should be life imprisonment for each of the defendants. The court having found the prior convictions to be true, sentenced each defendant to life imprisonment on the murder charge and to the term prescribed by law on the charge referred to in Count II, the sentences to run concurrently. The court further found each defendant to be an habitual criminal. Each defendant appealed. Kerfoot dismissed his appeal.

Neither of the defendants made any effort to cross-examine any witness, neither called any witness in his own behalf and neither testified in his own behalf.

The appellant now contends that: (1) he was deprived of the effective aid of counsel in that (a) the court permitted the private counsel to withdraw without notice, (b) the court erred in appointing the public defender who was unable to assist the appellant because he was engaged in another trial, (c) the court was in error in believing that it had no authority to appoint other counsel unless there was a "conflict," (d) the court erred and denied appellant the effective aid of counsel by refusing to appoint separate counsel for the defendants; (2) the court erred in denying appellant adequate opportunity to prepare his defense thus depriving him

of due process of law; (3) the deputy district attorney committed prejudicial misconduct in producing evidence of defendant's incarceration in Folsom Prison; and (4) the evidence was insufficient as a matter of law to sustain the judgment.

Considering appellant's first contention. It is apparent that he is correct. Section 284 of the Code of Civil Procedure provides as follows:

"The attorney in an action or special proceeding may be changed at any time before or after judgment or final determination, as follows:

"1. Upon the consent of both client and attorney, filed with the clerk, or entered upon the minutes;

"2. Upon the order of the court, upon the application of either client or attorney, after notice from one to the other except that in all civil cases in which the fee or compensation of the attorney is contingent upon the recovery of money, in which case the court shall determine the amount and terms of payment of the fee or compensation to be paid by the party."

Neither of the defendants was asked by the judge as to whether he consented to having his attorney withdraw from the case. It is obvious that Demes would not have consented to the withdrawal of Edwards as his attorney had he known that the judge was going to proceed as he did. In any event Demes did not give his consent to the withdrawal of Edwards as his attorney; he had received no notice that such a motion to withdraw was going to be made, and nothing was explained to him in advance with reference to the consequences of such a motion and the granting thereof. True it is that the matter of whether an attorney shall be relieved or not is within the sound discretion of a court but the appellant was entitled to notice, and in all fairness the matter should have been explained to him.

". . . The procedure set forth in sections 284 and 285 of the Code of Civil Procedure for a change of attorney applies to criminal as well as civil actions. (*People* v. *Bouchard,* 49 Cal.2d 438, 440-441 [317 P.2d 971]; see Code Civ. Proc., §§ 22, 24.) Petitioner did not consent to a change of attorney, no notice was given him until after the final judgment, and no order for a change of attorney was entered by the court. Thus petitioner remained attorney of record, and the trial court erred in allowing Martinez to proceed in person. (*People* v. *Merkouris,* 46 Cal.2d 540, 554-555 [297

P.2d 999].)'' (*In re Martinez,* 52 Cal.2d 808, 813 [345 P.2d 449].)

Justice Peters in the Martinez case, in a concurring and dissenting opinion said of the matter at pages 817-818:

''. . . Section 284 requires a consent by client and counsel filed with the clerk or an order of court after notice to the client and counsel. Until these sections are complied with petitioner remained the attorney of record and it was error to permit Martinez to proceed in person. (*People* v. *Merkouris,* 46 Cal.2d 540, 554 [297 P.2d 999].) The sections are not intended simply to protect the lawyer from being replaced without being heard, but are also aimed at protecting the rights of the accused. The framers of our Constitution saw fit to grant the right to counsel to those accused of crime. In implementing that right the Legislature saw fit to provide that, once counsel has been secured, such counsel cannot be removed except as provided in section 284. This is to protect an accused, a layman, from making legal decisions affecting his freedom, without the opportunity of chosen counsel being there and advising him not only of his legal rights, but of the result of his waiver of such rights. It is to protect an accused who is represented by counsel from the possibility of duress and pressure being exerted by the court or by the prosecution. It is to protect an accused who has counsel from forfeiting the protection of legal advice except as provided in the code section.

'' . . . . . . . . . . . .

''. . . The basic theory behind them is that the Legislature by section 1018, and also in sections 284 and 285, has seen fit to provide certain safeguards to protect one who waives counsel or purports to discharge his attorney. These safeguards are legislative implementations of the constitutional provision. The Legislature determined that these safeguards were necessary to protect those accused of crime. It is not for this court to say that such safeguards are merely 'procedural' and may be disregarded.''

Adequacy of notice is an element of due process of law. Where notice is required and particularly where it is extremely important to the defendant as in this case, there is no due process of law in the complete absence of any notice.

It is admitted that the public defender did nothing during his supposed term of representing the appellant other than to tell him that he (the public defender) was busy with another case and that when he was finished with such other

case he would talk with the appellant. The public defender never read the transcripts of the first trial. In fact the complete transcripts having to do with appellant were never made available nor were they produced in court until the day of the start of the second trial.

 With reference to the judge's authority to appoint counsel other than the public defender; we are of the opinion that under the facts and circumstances of this case the court not only had the clear authority to appoint separate counsel for Demes, but it was error not to so appoint such counsel. It would seem clear that there was every reason to believe Demes in his insistence that there was a conflict of interest between the two defendants. The judge said that the evidence of the first trial showed no conflict. It is true, however, that in a case such as this the evidence introduced into court constitutes but a small part of the total of the relationship between the defendants. It could well be that certain evidence was excluded or not introduced in the first trial (and therefore not in the transcript) for the very reason that there was such a conflict between them. As between the defendants the evidence was as varying as it could possibly be— Kerfoot was positively identified by at least two eyewitnesses as being the killer of Browse. No one testified that he saw appellant Demes at the scene of the robbery and the murder. Kerfoot was seen with a gun—the appellant was not seen with a gun. In the Las Vegas robbery one defendant apparently acted as the leader and the other, the appellant, apparently discouraged such a course of conduct. The judge, however, made it plain that he would consider nothing other than the testimony which was introduced in the first trial. He refused to weigh the innumerable intangible factors which exist in practically every case such as this.

As to the penalty trial, even the judge admitted that there might well be a conflict in that phase of the case.

The defendants and the public defender had a conflict before the first trial and it was understood by all concerned that there was a conflict of interest and that the public defender could not represent either of the defendants. It was never stated in open court what it was that constituted a conflict between the defendants during the first trial, and which was not in existence and could not have resulted in a conflict during the second trial.

For some reason, not apparent, the trial judge never did suggest that one of the defendants might be represented by

the public defender and the other by appointed outside counsel—this in spite of the fact that the public defender himself indicated such a course as a possible solution to the problem. Appellant suggested in his brief that perhaps the judge could have appointed Littlefield for one of the defendants and another person from the public defender's office to represent the other defendant; that in such event he at least would have had individual counsel. We place no stamp of approval upon such a proposed solution of the problem.

In *Glasser* v. *United States,* 315 U.S. 60 [62 S.Ct. 457, 86 L.Ed. 680], Glasser and Kretske were former Assistant United States attorneys and were indicted for conspiracy to defraud the United States. Just prior to the trial Kretske expressed dissatisfaction with his attorney and the judge, faced with a delay, asked Stewart, retained by Glasser as his attorney, if he would also act for Kretske. Stewart suggested a conflict of interest and Glasser expressed a desire to have his own attorney. There was a discussion and Stewart agreed to act as counsel for Kretske. Glasser neither acquiesced nor made any further objection. Both defendants were convicted. In reviewing the conviction of Glasser the court said among other things at pages 67 through 72:

"In all cases the constitutional safeguards are to be jealously preserved for the benefit of the accused, but especially is this true where the scales of justice may be delicately poised between guilt and innocence. Then error, which under some circumstances would not be ground for reversal, cannot be brushed aside as immaterial since there is a real chance that it might have provided the slight impetus which swung the scales toward guilt.

". . . . . . . . . . . .

"The guarantees of the Bill of Rights are the protecting bulwarks against the reach of arbitrary power. Among those guarantees is the right granted by the Sixth Amendment to an accused in a criminal proceeding in a federal court 'to have the assistance of counsel for his defense.' 'This is one of the safeguards deemed necessary to insure fundamental human rights of life and liberty' and a federal court cannot constitutionally deprive an accused whose life or liberty is at stake of the assistance of counsel. *Johnson* v. *Zerbst*, 304 US 458, 462, 463, 82 L ed 1461, 1465, 1466, 58 S Ct 1019. Even as we have held that the right to the assistance of counsel is so fundamental that the denial by a state court of a reasonable time to allow the selection of counsel of one's

own choosing, and the failure of that court to make an *effective appointment of counsel* may so offend our concept of the basic requirements of a fair hearing as to amount to a denial of due process of law contrary to the Fourteenth Amendment, *Powell* v. *Alabama,* 287 US 45, 77 L ed 158, 53 S Ct. 55, 84 ALR 527, so are we clear that the 'assistance of counsel' guaranteed by the Sixth Amendment contemplates that *such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests.* If the right to the assistance of counsel means less than this, a valued constitutional safeguard is substantially impaired. (Emphasis added.)

"To preserve the protection of the Bill of Rights for hard-pressed defendants, *we indulge every reasonable presumption against the waiver of fundamental rights. AEtna Ins. Co.* v. *Kennedy,* 301 US 389, 81 L ed 1177, 57 S Ct 809; *Ohio Bell Teleph. Co.* v. *Public Utilities Commission,* 301 US 292, 81 L ed 1093, 57 S Ct 724. Glasser never affirmatively waived the objection which he initially advanced when the trial court suggested the appointment of Stewart. We are told that since Glasser was an experienced attorney, he tacitly acquiesced in Stewart's appointment because he failed to renew vigorously his objection at the instant the appointment was made. The fact that Glasser is an attorney is, of course, *immaterial to a consideration of his right to the protection of the Sixth Amendment.* His professional experience may be a factor in determining whether he actually waived his right to the assistance of counsel. *Johnson* v. *Zerbst,* 304 US 458, 464, 82 L ed 1461, 1466, 58 S Ct 1019. But it is by no means conclusive. (Emphasis added.)

"*Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused. . . . The trial court should protect the right of an accused to have the assistance of counsel.* 'This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused. While an accused may waive the right to Counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record.' *Johnson* v. *Zerbst,* 304 US 458, 465, 82 L ed 1461, 1467, 58 S Ct 1019. (Emphasis added.)

"*No such concern on the part of the trial court for the*

*basic rights of Glasser is disclosed* by the record before us.
The *possibility* of the inconsistent interests of Glasser and
Kretske was brought home to the court, but instead of jeal-
ously guarding Glasser's rights, the court may fairly be said
to be *responsible for creating a situation which resulted* in
the impairment of those rights. . . . Under these circum-
stances to hold that Glasser freely, albeit tacitly, acquiesced
in the appointment of Stewart is *to do violence to reality and
to condone a dangerous laxity on the part of the trial court
in the discharge of its duty to preserve the fundamental
rights of an accused.*'' (Emphasis added.)

It is further stated at pages 75-76:

''*There is yet another consideration. Glasser wished the
benefit of the undivided assistance of counsel of his own
choice.* We think that such a desire on the part of an accused
should be respected. *Irrespective of any conflict of interest
the additional burden of representing another party may con-
ceivably impair counsel's effectiveness.* (Emphasis added.)

''To determine the precise degree of prejudice sustained
by Glasser as a result of the court's appointment of Stewart
as counsel for Kretske is at once difficult and unnecessary.
*The right to have the assistance of counsel is too fundamental
and absolute to allow courts to indulge in nice calculations
as to the amount of prejudice arising from its denial.* . . .
Of equal importance with the duty of the court to see that
an accused has the assistance of counsel is its duty to refrain
from embarrassing counsel in the defense of an accused by
insisting, or indeed, even suggesting that counsel undertake
to concurrently represent interests which might diverge from
those of his first client, when the possibility of that divergence
is brought home to the court. In conspiracy cases, where the
liberal rules of evidence and the wide latitude accorded the
prosecution may, and sometimes do, operate unfairly against
an individual defendant, it is especially important that he
be given the benefit of the undivided assistance of his coun-
sel without the court's becoming a party to encumbering
that assistance. Here the court was advised of the possibility
that conflicting interests might arise which would diminish
Stewart's usefulness to Glasser. Nevertheless Stewart was ap-
pointed as Kretske's counsel. Our examination of the record
leads to the conclusion that Stewart's representation of
Glasser was not as effective as it might have been if the ap-
pointment had not been made. We hold that the court thereby
denied Glasser his right to have the effective assistance of

counsel, guaranteed by the Sixth Amendment. This error requires that the verdict be set aside and a new trial ordered as to Glasser.''

The court should not weigh the amount of prejudice arising from a denial of a constitutional right such as the assistance of counsel.

We call particular attention to that part of the Glasser case which indicates that even in the absence of a conflict of interest the same rule would apply since counsel's ''effectiveness *might be impaired by adding to his burden the representation of another co-defendant.*'' (Emphasis added.) In our case it is to be remembered that both Edwards and LeSage were relieved because of ''emotional and physical exhaustion'' from the first trial and yet one man was expected to carry the entire load of the second trial.

The matter of economy and practicability ought not to be a factor in matters of such grave importance. True it is that there are no public servants, other than lawyers, who can be required to serve as a lawyer is required to serve, but it is also true there is no requirement for the allowance of fees in the size of the fees allowed in this case. (See *Hill* v. *Superior Court*, 46 Cal.2d 169 [293 P.2d 10].) Among the more than 8900 lawyers in Los Angeles County, surely there were at least two who could and would have conscientiously and effectively represented the defendants for a reasonable compensation as defined in the Hill case.

In *People* v. *Lanigan,* 22 Cal.2d 569 [140 P.2d 24, 148 A.L.R. 176] the court pointed out that the right as provided by the Sixth Amendment to the United States Constitution is protected in California by article I, section 13 of our Constitution and further the court stated in effect that it adopted the philosophy stated in the Glasser case. The court said at pages 576-577:

''. . . In criminal cases it frequently occurs that circumstances which make it advisable for one defendant to testify are not present when consideration is given to the question of offering another defendant as a witness. One may be vulnerable to impeaching questions and the other not. It might be highly desirable that the one not so vulnerable take the witness stand and the other not. If the former should do so and the other not, the circumstances might weigh heavily against the latter in the minds of the jury. A like prejudice might not occur if the defendants were represented by sepa-

rate counsel. Each of the defendants was entitled to have questions of this nature considered and decided by counsel independently of the interests of the other. And counsel should not be hampered or embarrassed by being compelled to choose one course as against the other because of the action taken by the court.

"In *Powell* v. *Alabama,* 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527], it was stated that 'the failure of the trial court to make an effective appointment of counsel was likewise a denial of due process within the meaning of the Fourteenth Amendment.' So in the present case there was a failure to make an 'effective appointment of counsel.' It must therefore be concluded that the trial court erred prejudicially in forcing the defendant Giardano to share the attention and efforts of his counsel with the other defendant, and that the court likewise so erred in forcing the defendant Lanigan to be represented by counsel who did not wish to represent him, who objected to the order of the court appointing him and who did not feel that he could properly represent him. In such circumstances counsel was not in a position freely to decide what was most advantageous for the defense of one client without weighing against it the disadvantage that might result to the other."

In *State* v. *Karston,* 247 Iowa 32 [72 N.W.2d 463] there was involved the case of the defendant (appellant) and a codefendant charged with murder. The appellant admitted doing the actual shooting and he was the instigator and leader in the crime. The trial judge appointed a single lawyer to represent both defendants and each was found guilty of murder in the first degree. At the hearing on the sentence (which had to be either hanging or life imprisonment), counsel was compelled to recognize a difference between the defendants as to ages, past records, leadership, etc. The conflict was not called to the attention of the trial court in the first instance.

In deciding the case the court said among other things at page 465:

"No matter how ruthlessly he may have disregarded the rights of others, no matter how callously he may have deprived innocent citizens of their lives or property without notice or the slightest opportunity for defense, the wrongdoer, when brought to book in a court of justice, is always quick to insist upon his own rights, to the last technicality; and it is the settled and just policy of our law to give them to him.

The more serious the offense of which he is accused, the more carefully will the safeguards of the law be thrown around him. It will not do in any case to say that the accused is plainly guilty of an atrocious murder and so the means used to convict is justified by the end to be attained.

". . . . . . . . . . . .

"*It should be noted that the state courts are bound by the federal courts' interpretation of the law on this point, at least where capital offenses are concerned. Bute* v. *People of State of Illinois,* 333 U.S. 640, 674, 68 S.Ct. 763, 780, 92 L.Ed. 986; *Uvegas* v. *Commonwealth of Pennsylvania,* 335 U.S. 437, 440, 441, 69 S.Ct. 184, 185, 186, 93 L.Ed. 127; *Glasser* v. *United States,* 315 US. 60, 70, 71, 62 S.Ct. 457, 464, 465, 86 L.Ed. 680; *Powell* ˅. *Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.k. 527. It is the definite holding of the Supreme Court of the United States that a failure of a state court to make an effective appointment of counsel may in all cases where the defendant is charged with a serious offense, and certainly does in capital cases, so offend the basic requirements of a fair hearing as to amount to a denial of due process of law contrary to the terms of the Fourteenth Amendment. (Emphasis added.)

". . . . . . . . . . .

"We have no criticism of counsel for his statement. He was placed in an impossible position, which perhaps both he and the trial court should have recognized, when he undertook to represent both defendants. It will generally be found when two or more are accused of a serious crime, that their interests are to some extent divergent. Often the question will arise as which was the planner of the crime, which took the leading part, or in many other ways each may desire to attempt to throw the onus upon the other. Separate lawyers for separate defendants may not in all cases prove an unmixed blessing; the result may be attempts by each to cast the blame upon the other, to the profit of the prosecution. *But it is settled that where there may be adverse interests, each defendant is entitled to separate representation. Glasser* v. *United States, supra*; *People* v. *Lanigan,* 22 Cal.2d 569, 140 P.2d 24, 148 A.L.R. 176, and annotations beginning on page 183 of 148 A.L.R.; *People* v. *Rose,* 348 Ill. 214, 180 N.E. 791; *People* v. *Bopp,* 179 Ill. 184, 116 N.E. 679." (Emphasis added.)

Canon 15 of the Canons of Professional Ethics of the

American Bar Association makes provision as to how far a lawyer may go in supporting a client's cause.[1]

Canon 37 of the Canons of Professional Ethics of the American Bar Association makes provisions with reference to the confidences of a client.[2]

The judge should not have asked Edwards to disclose to the court what his opinion was with referenec to any conflict of interest between the defendants. Any opinion Edwards had necessarily was based upon what Demes told him or upon what he found out in representing Demes. Edwards was in effect being asked to express a view exactly contrary to the repeatedly expressed views of his client or former client, Demes. In other words, Edwards was in effect being asked to volunteer information which might have had the effect of ruining his client's chances of having separate counsel. Edwards should have asked the judge to be excused from answering the question or giving an opinion because he, Edwards, was under a duty to preserve his client's confidence. The rule is not one of mere professional conduct. (See 3 Wigmore on Evidence, 3d ed., § 2292; Opinions of the Committee on Professional Ethics and Grievances of the American Bar Association, Nos. 150, 163, 202.)

 It is true that if no adverse interest *exists* and *none is claimed*, the representation of more than one defendant by

[1] Canon 15 provides in part:

"The lawyer owes 'entire devotion to the interest of the client, warm zeal in the maintenance and defense of his rights and the exertion of his utmost learning and ability,' to the end that nothing be taken or be withheld from him, save by the rules of law, legally applied. No fear of judicial disfavor or public unpopularity should restrain him from the full discharge of his duty. In the judicial forum the client is entitled to the benefit of any and every remedy and defense that is authorized by the law of the land, and he may expect his lawyer to assert every such remedy or defense. But it is steadfastly to be borne in mind that the great trust of the lawyer is to be performed within and not without the bounds of the law. The office of attorney does not permit, much less does it demand of him for any client, violation of law or any manner of fraud or chicane. He must obey his own conscience and not that of his client."

[2] Canon 37 provides in part as follows:

"It is the duty of a lawyer to preserve his client's confidences. This duty outlasts the lawyer's employment, and extends as well to his employees; and neither of them should accept employment which involves or may involve the disclosure or use of these confidences, either for the private advantage of the lawyer or his employees or to the disadvantage of the client, without his knowledge and consent, and even though there are other available sources of such information. A lawyer should not continue employment when he discovers that this obligation prevents the performance of his full duty to his former or his new client."

a single attorney is permissible. (*Sanders* v. *United States,* 183 F.2d 748; *Setser* v. *Welch,* 159 F.2d 703; *Farris* v. *Hunter,* 144 F.2d 63; *United States* v. *Rollnick,* 91 F.2d 911; *Collingsworth* v. *Mayo,* 85 F.Supp. 207.)

In *People* v. *Meacham,* 84 Cal.App.2d 193 [190 P.2d 262], the court made no inquiry to ascertain if there might be a conflict, no objection was made to the trial judge and there was nothing to indicate that there was any conflict. Such is not the situation in the case before us.

When the defendants' defense is slighted for fear of prejudicing a codefendant (barring a waiver as in *People* v. *Rocco,* 209 Cal. 68 [285 P. 704] and *People* v. *Fernandez,* 301 N.Y. 302 [93 N.E.2d 859]) it is error to have one counsel for more than one defendant. (*Glasser* v. *United States, supra,* 315 U.S. 60; *Wright* v. *Johnston,* 77 F. Supp. 687; *People* v. *Robinson,* 42 Cal.2d 741 [269 P.2d 6]; *People* v. *Lanigan, supra,* 22 Cal.2d 569; *People* v. *Rose,* 348 Ill. 214 [180 N.E. 791]; *People* v. *Bopp,* 279 Ill. 184 [116 N.E. 679].)

In the case before us, had each defendant had a separate attorney each defendant would have been afforded his constitutional rights.

To say that the appellant here was afforded due process of law and that he was fairly treated is in effect to substitute artificial reasoning and mechanical jurisprudence for fundamental rights. We must look to the realities of the situation and not just to a semiformal compliance with procedural rules.

The next contention of appellant is that he was not afforded an opportunity to prepare his defense. The transcript of the testimony of the first trial consisted of twelve volumes. The appellant apparently received seven of the total volumes on Friday before the Monday on which the trial started. He received five volumes of the transcript within a few minutes from the time the selection of a jury was undertaken. The bare statement of the facts of what took place is enough to demonstrate the complete unfairness of the procedure which was followed.

The public defender admittedly did nothing towards the defense of appellant. The judge for some reason not apparent stated that he would grant a continuance of the trial if the defendants would accept the public defender as their counsel, but that if they would not accept the public defender the case would proceed to trial at once. It is obvious therefore that the rejection of any continuance to the appellant was

not because of the court's calendar. If the public defender, a skilled, trained and experienced lawyer, needed time to prepare, how much more so did appellant need time within which to at least read the transcript and understand what had been testified to in the prior case. A reading of the transcript of the second trial shows that there were many situations where intelligent cross-examination would have been of great assistance in ascertaining the truth. Whether the truth would have been of benefit or detriment to the appellant it cannot be said, because as it was, there was *no* cross-examination. (See *People* v. *Mattson*, 51 Cal.2d 777, footnote at page 790 [336 P.2d 937], for a statement of the right to counsel and time within which to prepare a defense. The same rules with reference to time within which to prepare should apply to an accused who is not represented by counsel.)

The next contention of the appellant has to do with the testimony of the Folsom Prison guard or officer who stated that he saw the defendants with other prisoners talking with each other in the prison some two years and three months before the burglary in Reno. There was no objection to the testimony because the appellant in his ignorance of the rules of evidence did not know what to do other than to ask repeatedly for independent counsel. Where a matter of public policy is involved it is not necessary for the defendant to object. (*People* v. *Rodriguez*, 58 Cal.App.2d 415, 421 [136 P.2d 626].)

The deputy district attorney in his opening statement to the jury (before he knew whether the defendants, or either of them would testify), said:

"During the course of this trial we expect to show by calling the Correctional Officer at Folsom Prison that the defendants while inmates of Folsom Prison were friends and knew one another, that the defendant Demes was released from Folsom Prison, which is in Sacramento County, on the 13th of October, 1956, that the defendant Kerfoot was released from Folson (*sic*) Prison on the 2nd of October, 1958. Thereafter these two men got together."

It is apparent that the last talk the defendants could have had with each other in prison was more than two years and three months before any crime with which we are now concerned was committed. There was no showing that the defendants communicated with each other in any respect after Demes was released and while Kerfoot remained in prison. The defendants each admitted the charged prior convictions in the

absence of the jury. The prosecution by a devious and improper way informed the jury in effect that the defendants were recidivists or incorrigibles and for such conduct had been confined in a maximum security prison in California.

The general rule is that no evidence of a prior crime which is wholly independent of that for which the accused is on trial is admissible. The potential value of such evidence of prior crime is far outweighed by the prejudicial effect of such evidence. The tendency and the purpose of the evidence in this case to the effect that defendants were former inmates of Folsom Prison was to show that the defendants were bad men, that they had committed other crimes and that therefore there was great probability of their guilt. It is true that there are many exceptions to the rule (of excluding former crimes) such as introducing evidence of previous crimes to show motive, intent, identity, design or plan, knowledge and perhaps some others but the evidence here introduced was not within any exception to the rule. The record shows that the court instructed the jurors with reference to how they were to consider the evidence concerning the burglary in Reno and the other robberies, but nothing was said specifically about how they were to consider the evidence of the defendants having been in Folsom Prison.

It was said in *People* v. *Newson*, 37 Cal.2d 34 at 47 [230 P.2d 618] with reference to this subject matter, as follows:

" 'A defendant in a criminal action cannot be required to defend himself against the charge of any crime other than that for which he is on trial, but this rule does not exclude evidence which incidentally discloses the commission of another offense. Evidence which is relevant in establishing guilt of the crime charged is admissible notwithstanding the fact that it tends to connect the accused with an offense not included in the charge.' (*People* v. *Dabb*, 32 Cal.2d 491, 499 [197 P.2d 1]; *People* v. *Peete*, 28 Cal.2d 306, 314-315 [169 P.2d 924].) But this rule must be exercised with extreme caution for the natural tendency of the jury is to give excessive weight to a defendant's vicious record of crime.

For this reason, it has been said: 'The relevancy of evidence that proves crimes other than that charged must, of course, be examined with care, due to the prejudicial nature of all such evidence, and it should not be admitted simply on the showing that some part of that transaction is relevant to the case. *The possibility of severing relevant from irrele-*

*vant portions should, in every case, be considered, thereby protecting the defendant against reference to other crimes where it has no tendency to establish facts pertinent to the proof of the crime charged.'* (*People* v. *Dabb, supra,* at p. 500.)''

Appellant's last contention is that the evidence was insufficient to sustain the judgment. We entertain no doubt that had the appellant been represented by sufficiently prepared, independent and effective counsel and had there been no reference to the Folsom Prison talks, that the evidence would have been sufficient to sustain the judgment; however, it is not necessary to elaborate upon that point for if the case is to be retried the determination then made will be upon the evidence introduced at that trial.

What was said by Mr. Justice White in *People* v. *Zammora,* 66 Cal.App.2d 166, 236 [152 P.2d 180] is particularly appropriate in this matter, namely:

''We are not unmindful of the flagrancy of the offenses charged. Nor are we insensible to the need and importance of strictly enforcing the law for the prevention of such crimes. It is greatly to be desired for the safety of the public that the guilty be apprehended and punished for their crimes. But, as a stabilizing influence looking toward the permanence of our institutions, it is of equal or greater importance that the guaranty of a fair trial in accordance with the meaning and intent of the Constitution and statutes should be assured and that such a trial be made a certainty so far as possible within the bounds of average human ability, attended by its unavoidable imperfections and frailties.''

The judgment is reversed.

Lillie, J., and Scott (Robert H.), J. pro tem.,* concurred.

Respondent's petition for a hearing by the Supreme Court was denied November 9, 1960.

---

*Assigned by Chairman of Judicial Council.