[Crim. No. 4487.   In Bank.   July 27, 1943.]

THE PEOPLE, Respondent, v. JAMES LANIGAN et al.,
Appellants.

Morris Lavine, Richard Cantillon and John E. Glover for Appellants.

Robert W. Kenny, Attorney General, Earl Warren, Attorney General, Gilbert F. Nelson, Deputy Attorney General, Fred N. Howser, District Attorney, John F. Dockweiler, District Attorney, Jere J. Sullivan and Marcus R. Brandler, Deputies District Attorney, for Respondent.

SHENK, J.—The defendants, James Lanigan and Antony Giardano, were jointly indicted for the crime of robbery. On the first trial the jury disagreed, and the second resulted in verdicts of guilty as to both defendants. They appeal from the judgments of conviction and from an order denying their motions for a new trial. There is no contention that the evidence is insufficient to support the verdicts. The principal contentions of the defendants are that their right of counsel was infringed; that an alternate juror was improperly substituted by the trial court; and that their motions to dismiss the case should have been granted.

On June 18, 1941, at a few minutes before 3 p. m., the cashier of the Prudential Life Insurance Company in the company's office in Los Angeles prepared the cash receipts for deposit in the bank. She wrapped the money in two bundles and took them to the desk of Ruth Lewis, an 18 year old girl recently employed, and asked her to take them to the bank. The cashier then called K. E. Powers, assistant superintendent for the company, and asked him to accompany Miss Lewis. The company offices were on the second floor of the building. As Miss Lewis and Mr. Powers descended the stairs, a man wearing dark glasses and a hat, with a handkerchief held up to his face as if wiping his forehead, passed them going up stairs. Descending a few steps further, they were accosted by a man coming toward them with a shopping bag in one hand. He was also wearing dark glasses. He

pointed a gun at them saying, "This is a stick up." Miss Lewis was ordered to put the money in the shopping bag. The man who had passed them on the stairs came down with a gun in his hand. Mr. Powers and Miss Lewis were ordered to return to the office and say nothing, but they immediately notified the cashier. No trace of the robbers could then be found.

On July 10, 1941, the defendants were arrested by state patrolmen at Collinsville, Illinois, while in the vicinity of a tavern near the Fairmount Race Track, about 12 miles from St. Louis, Missouri. Lanigan and Giardano were accompanied by a third man, Michaels, who was armed with an army pistol. Lanigan, the owner and driver of the car in which the three men were riding, had a revolver in his belt and another revolver was found in the front of the car. Also found in the car were a pair of Kansas state license plates and a pair of Illinois license plates. Giardano was unarmed. The defendants offered no resistance and were taken to the Collinsville police station. Photographs of the men were sent to Los Angeles and were identified by Miss Lewis and Mr. Powers as the men who had held them up. These photographs were again exhibited to Miss Lewis and Mr. Powers just before they saw the defendants in person in Illinois. Upon seeing Lanigan and Giardano they positively identified them as the men who had staged the holdup.

At the first trial Giardano was represented by Morris Lavine and Lanigan by Cantillon and Glover. On January 28, 1942, at the time the mistrial was declared, Mr. Cantillon explained to the court that he was about to begin on a trial that might last two months, and that with Lanigan's consent he and his associate had been released. The court reset the cases for trial on March 9, 1942, at 10 o'clock a. m., and instructed Lanigan to be prepared to proceed with counsel on that date.

At 9:30 a. m. on March 9, Giardano appeared with Mr. Lavine as his counsel. Lanigan was present without counsel. Mr. Glover also appeared and requested to make a statement in regard to Lanigan. He called the court's attention to the fact that "we" (meaning Mr. Cantillon and himself) "were released from the defense on the record. Now, I understand from Mr. and Mrs. Lanigan both that something Mr. Can-

tillon said to them indicated he would go through with the case; but Mr. Cantillon says that is not the case. Apparently the defendant has suffered some prejudice by that to this extent that I understand he has no counsel at all and will have to be represented by the Public Defender.'' The court replied that on January 28th the defendant Lanigan had been admonished to be ready for trial on March 9th either with Mr. Cantillon as his counsel or with other counsel. The court then asked Lanigan if he recalled the admonition. The reply was ''Yes, but it puts me in a difficult position. I was advised that he [Cantillon] would be ready . . . I thought I was prepared to go to trial.''

The following then occurred:

''THE COURT: Under those circumstances I don't see anything to do but to go to trial today.

''DEFENDANT LANIGAN: You wouldn't want me to go to trial without counsel, would you?

''THE COURT: I gave you every opportunity, Mr. Lanigan. I told you the case would go to trial and it has to go to trial.''

The defendant then asked for a continuance until he could secure counsel. The district attorney opposed the request on the ground that witnesses were present from the East and that Mr. Lavine was present at the first trial as counsel for Giardano, intimating, it is assumed, that Mr. Lavine might then also represent the defendant Lanigan. The trial judge stated to Mr. Lavine that he thought there were no conflicting interests as between the defendants. Mr. Lavine replied that he felt that their interests might conflict. The record then discloses the following: ''The Court will deny the motion for continuance and will appoint Mr. Lavine to represent the defendant Lanigan.''

''MR. LAVINE: Let the record show that that is over the objection of myself and the defendant Lanigan. . . .

''THE COURT: The record will so show. We will proceed to trial at 10 o'clock.

At 10 o'clock the case was called and the following occurred:

''MR. LAVINE: The defendant Giardano is ready. As far as Mr. Lanigan is concerned, as previously stated, he objects to proceeding to trial at this time for the reasons heretofore stated. He is not prepared and that he was under the belief

that his former counsel would again come into the case. He just learned this morning, he states, that he will not come into the case. Therefore he is not ready to proceed. On the further ground that the representation of Mr. Lanigan by the counsel for Mr. Giardano is opposed by Mr. Lanigan on the ground that there would be conflict of interests and the representation of Mr. Lanigan by counsel for Giardano is opposed on the same ground.

"THE COURT: In order to keep the record clear in this matter the motion for continuance made in propria persona by the defendant Lanigan having been denied the Court at this time asks the defendant Lanigan to elect between representing himself or having Mr. Lavine represent him.

"DEFENDANT LANIGAN: Well, can I consult Mr. Lavine?

"MR. LAVINE: Mr. Lavine objects to being consulted on that motion.

"THE COURT: All right, let the record show that Mr. Lavine objects to being consulted on the question of the Court. It is up to you, Mr. Lanigan.

"MR. LAVINE: On the ground that there will be a conflict in the interests and the two interests are separate and apart.

"THE COURT: I will request you to make the election at this time, Mr. Lanigan, either represent yourself in the matter or be represented by Mr. Lavine as an officer of the Court.

"DEFENDANT LANIGAN: If the Court please, if Mr. Lavine represents me it is with my objection. I cannot represent myself.

"THE COURT: I understand that you are objecting to the order of the Court requiring you to elect and whichever course you adopt will be over your objection.

"DEFENDANT LANIGAN: Yes.

"THE COURT: At the order of the Court.

"DEFENDANT LANIGAN: I am in the position where I have to have an attorney. In other words, I am between the devil and the deep blue sea.

"THE COURT: Having had some 30 days' notice, however, of the fact that the case was going to trial on this date and that you would be required to have counsel at this time.

"MR. LANIGAN: As I stated before I did believe I had counsel and I am not ready to go to trial.

"THE COURT: That question has been disposed of. I am now asking you to elect as to whether you want to represent yourself or have Mr. Lavine represent you as an officer of the Court.

"DEFENDANT LANIGAN: I should like an opportunity to consult some counsel as to that.

"THE COURT: I am afraid we can't give you that opportunity. You have had 30 days in which to prepare for this and I will have to ask you to declare your choice at this time.

"DEFENDANT LANIGAN: I am in an awful spot. I don't know what to do. I can't defend myself.

"THE COURT: You don't feel capable of defending yourself?

"DEFENDANT LANIGAN: No. It has always been taught to me that every person in this country has a right to counsel.

"THE COURT: You are correct about that.

"DEFENDANT LANIGAN: This is an important matter in my life. Fortunately we have a higher court.

"THE COURT: Yes, that is right. That is why I want to keep the record straight in this matter so that if it goes to a higher court the higher court will know just what the proceedings were.

"DEFENDANT LANIGAN: I realize that. I am not qualified to answer your question. I can't defend myself and I don't care to have Mr. Lavine defend me.

"THE COURT: You don't want to represent yourself?

"DEFENDANT LANIGAN: No.

"THE COURT: In that circumstance the Court will appoint Mr. Lavine as an officer of the Court and the record will show it is over your protest and over the protest of Mr. Lavine."

The defendants contend that prejudicial error was committed in denying to Giardano the undivided assistance of his counsel and in forcing upon Lanigan an attorney whom he did not wish to have as his counsel. The defendants insist that the present case is strikingly similar to the case of *Glasser* v. *United States* (315 U.S. 60 [62 S.Ct. 457, 86 L. Ed. 680]) decided January 19, 1942, by the United States Supreme Court, in which the facts were as follows: Glasser, an Assistant United States Attorney for the Northern District of Illinois, and Kretske, another Assistant District Attorney, and others were charged with conspiracy to defraud the United States in the prosecution of liquor cases. At the opening of

trial, McDonnell, the counsel who had been appointed to represent Kretske, informed the court that Kretske did not wish to have him as his attorney. The court suggested that Stewart, Glasser's attorney, represent both defendants. Glasser objected. The court then informed McDonnell he would have to continue with the case until Kretske could get another lawyer. Kretske then told the court that Mr. Stewart had said that if the court wished to appoint him "I think we can accept the appointment." Stewart was appointed, and Glasser registered no further objections. On appeal Glasser charged as prejudicial the denial of his right to counsel of his own choosing and the undivided assistance of that counsel. The Supreme Court reversed the conviction as to Glasser on the ground that the Sixth Amendment had been violated. It was pointed out that the conflict of interests had made it necessary for Stewart to fail to object to certain testimony admissible as to Kretske but inadmissible as to Glasser. Furthermore the court stated: "There is yet another consideration. Glasser wished the benefit of the undivided assistance of counsel of his own choice. We think that such a desire on the part of an accused should be respected. Irrespective of any conflict of interest the additional burden of representing another party may conceivably impair counsel's effectiveness.

"To determine the precise degree of prejudice sustained by Glasser as a result of the court's appointment of Stewart as counsel for Kretske is at once difficult and unnecessary. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial. [Citing cases.] Of equal importance with the duty of the court to see that an accused has the assistance of counsel is its duty to refrain from embarrassing counsel in the defense of an accused by insisting, or indeed, even suggesting that counsel undertake to concurrently represent interests which might diverge from those of his first client, when the possibility of that divergence is brought home to the court. . . ."

Although the Sixth Amendment is applicable only to trials in federal courts (*Betts* v. *Brady,* 316 U.S. 455 [62 S.Ct. 1252, 86 L. Ed. 1595]), the same right is protected in this state by article 1, section 13 of our Constitution providing that "In criminal prosecutions, in any court whatever, the

party accused shall have the right . . . to appear and defend, in person and with counsel."

In the Glasser case the co-defendant Kretske consented to the appointment of Glasser's counsel to represent him. Glasser objected and was in the same situation as the defendant Giardano in the present case. Unlike Kretske in that case, the co-defendant Lanigan in this case vigorously objected.

There are many reasons why the objections of Mr. Lavine. and the defendants themselves should have been respected. Mr. Lavine had been employed by Giardano as his sole counsel. That employment carried with it a very definite professional obligation on the part of Mr. Lavine. The engagement required him to "maintain inviolate the confidence, and at every peril to himself to preserve the secrets, of his client" (subd. (e) sec. 6068, State Bar Act). That admonition to lawyers is as old as the canons of professional ethics. Undivided loyalty to the cause of his client is essential to the personal integrity of counsel and to the maintenance of the high standards of the legal profession. Under the circumstances here presented, fidelity to the client who first employed him would have foreclosed Mr. Lavine from voluntarily representing the co-defendant. Since voluntary employment in that behalf would have been improper, compulsory representation should not have been imposed. Mr. Lavine was therefore well within his rights in objecting to his appointment as counsel for Lanigan and Giardano was entitled to the undivided assistance of the counsel whom he had employed. As to the defendant Lanigan, he requested but was refused the right to consult counsel as to the important question whether he would be prejudiced by being represented by counsel for the other defendant. He was represented by order of court by counsel with whom he had no opportunity to confer. When the time came for the presentation of their defense Mr. Lavine was confronted with the delicate question whether to advise them to testify in their own behalf, for the failure of a defendant "to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury" (Cal. Const., art. I, sec. 13, as amended in 1934). In criminal cases it frequently occurs that circumstances which make it advisable for one defendant to testify are not present when consideration is

given to the question of offering another defendant as a witness. One may be vulnerable to impeaching questions and the other not. It might be highly desirable that the one not so vulnerable take the witness stand and the other not. If the former should do so and the other not, the circumstance might weigh heavily against the latter in the minds of the jury. A like prejudice might not occur if the defendants were represented by separate counsel. Each of the defendants was entitled to have questions of this nature considered and decided by counsel independently of the interests of the other. And counsel should not be hampered or embarrassed by being compelled to choose one course as against the other because of the action taken by the court.

In *Powell* v. *Alabama*, 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527], it was stated that "the failure of the trial court to make an effective appointment of counsel was likewise a denial of due process within the meaning of the Fourteenth Amendment." So in the present case there was a failure to make an "effective appointment of counsel." It must therefore be concluded that the trial court erred prejudicially in forcing the defendant Giardano to share the attention and efforts of his counsel with the other defendant, and that the court likewise so erred in forcing the defendant Lanigan to be represented by counsel who did not wish to represent him, who objected to the order of the court appointing him and who did not feel that he could properly represent him. In such circumstances counsel was not in a position freely to decide what was most advantageous for the defense of one client without weighing against it the disadvantage that might result to the other.

There is no merit in the contention of the defendants that error was committed by the substitution of an alternate juror. On the second day after the case had been submitted to the jury one of the woman jurors became ill from an intestinal disturbance and continued to be in distress for several hours. She was examined by a physician who reported to the court that he could give no definite assurance as to when she would recover. With the consent of both parties the judge also questioned the juror privately and was told by her that her illness was due in some degree to the nervous strain of the deliberations. After careful inquiry as to her physical

condition the court concluded that the juror was ill to the extent that she was unable to perform a juror's duties and that the alternate should be substituted in her place. The jury continued its deliberations on the following morning and at about three o'clock that afternoon reached a verdict finding the defendants guilty as charged.

All of the defendants' contentions in this connection are answered by statute law and the decisions. In *People* v. *Ross*, 85 Cal. 383 [24 P. 789], it was held that the discharge of the jury, on account of sickness of one of the jurors, over the defendant's objection, did not constitute jeopardy. That case was decided in 1890. In 1895 (Stats. 1895, p. 279), in order to obviate a discharge of the jury in such cases, the Legislature enacted section 1089 of the Penal Code to provide for alternates in protracted trials, and the substitution of an alternate for a juror who might become ill before the submission of the case to the jury. The constitutionality of those provisions was sustained in *People* v. *Peete*, 54 Cal.App. 333 [202 P. 51], where it was held that the right to be tried by a jury of twelve was not thereby infringed. In 1933, (Stats. 1933, p. 1342) the section was further amended to provide that "if at any time, whether *before* or *after* the final submission of the case to the jury," a juror is unable to perform his duty on account of illness he may be replaced by an alternate. The amendment was upheld in *People* v. *von Badenthal*, 8 Cal.App.2d 404 [48 P.2d 82], where an alternate was substituted "after the jury had been deliberating for some time without arriving at a verdict." That case also answers the contention that the evidence was not sufficient to justify the discharge of the juror, because it was shown at a later time that in a few days she was back at her employment. It was pointed out that the "action of the court must be tested in the light of the evidence before it at the time of the decisions," which, in this case, unquestionably warranted the court in discharging the juror. In the case of *People* v. *Love*, 21 Cal.App.2d 623 [70 P.2d 202], the contention was made and rejected that the provision for the substitution of a juror after submission of the case to the jury was unconstitutional.

█ It is contended by the defendants that the trial court should have granted the motion to dismiss the case on the ground that it was not brought to trial within the time pre-

scribed by section 1382 of the Penal Code, and that they were denied their constitutional rights to a speedy trial.

The indictment was returned on September 3, 1941. On September 8 the defendant Lanigan pleaded not guilty and his trial was set for October 27. The defendant Giardano was apprehended later and was arraigned on September 26. He pleaded not guilty and his trial was set for October 31. On October 17, on motion of both defendants, their trial was continued to November 27, 1941, each defendant expressly waiving the statutory time for trial. On November 7, 1941, the cases were advanced on the calendar to that date at the request of the prosecution and the defendants for the purpose of fixing a date later than November 27. At that time the prosecution stated to the court that the defendants wished to take depositions in St. Louis, Missouri, and Reno, Nevada, and that the prosecution would bring witnesses from eastern points, some of whom were scheduled to appear as witnesses in the federal court on January 20, 1942, in a case in which the defendants were charged with transporting from one state to another the guns used in the commission of the robbery charged in the present case. When the court informed counsel that the calendar was filled for December both defendants stated that they would be ready on November 27, 1941, and objected to a continuance. The court then set the case for trial for January 9, 1942. Defendant Giardano obtained on December 27, 1941, an order for the issuance of a commission to take the depositions of witnesses residing in St. Louis, Missouri, and on January 5, 1942, obtained the issuance of a commission to take the depositions of additional witnesses residing in St. Louis. Early in January, 1942, defendant Lanigan obtained an order for the issuance of a commission to take the depositions of witnesses residing in Reno, Nevada. On January 9, 1942, when the case was called for trial defendant Lanigan asked that the case be continued until January 14, 1942, basing his motion upon the ground that his counsel was engaged in another trial and on the further ground that depositions which he was taking had not been filed with the court. This motion was granted.

It clearly appears from the record that at the time of their appearance in court on November 7, 1941, all parties were in favor of a continuance to a date later than Novem-

ber 27, 1941. The court's calendar was congested during the month of December and the continuance to January 9, 1942, was not an abuse of discretion *(Murphy* v. *Superior Court,* 53 Cal.App. 6 [200 P. 483]). Before the end of December and early in January each defendant sought and obtained an order to take depositions out of the state. These facts furnished further justification for the continuance.

Other points are made by the defendants. They relate to matters of procedure which are not likely to recur on a retrial and therefore need not be discussed.

The judgments and the order denying the motion for a new trial are reversed.

Gibson, C. J., Curtis, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.