[Crim. No. 4038.   First Dist., Div. One.   Feb. 6, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN RICH-
ARD DONOHOE et al., Defendants and Appellants.

John R. Aye, under appointment by the District Court of Appeal, for Defendants and Appellants.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Nat A. Agliano, Deputy Attorney General, for Plaintiff and Respondent.

SULLIVAN, J.—Defendants John Richard Donohoe and Roberta Grace Hinson were charged in an information with the robbery of one Joe Zoller and in a second count with having committed an assault on Zoller by means of force likely to produce great bodily injury. Donohoe was also charged with three prior convictions. A jury found the defendant Donohoe guilty of both counts and the defendant Hinson guilty of robbery but not guilty of the assault. Upon motions made separately as to each defendant, the matter was then referred to the probation officer pending pronouncement of judgment and sentence. The court denied probation to Donohoe but granted probation to Hinson for a period of five years, the first year to be spent in the county jail. The motion of both defendants for a new trial was denied. Both defendants appeal from the judgment of conviction[1] and from the order denying their motion for a new trial.

At about 1 a. m. on Sunday morning, October 23, 1960, the prosecuting witness Joe Zoller, a 70-year-old construction work inspector, entered the Solano Inn, located in Vallejo, took a seat at the bar and ordered a drink of beer. He had on his person at the time the sum of $150 or $160 which was the balance of his wages for two weeks. The defendant Hinson was also seated at the bar, not too far away. She moved over near Zoller and the two got into a conversation. Zoller testified that Mrs. Hinson moved over without his invitation. According to the bartender, Zoller ordered a drink of whiskey when he came in and almost immediately invited Mrs. Hinson to join him. They then had several drinks together, for all of which Zoller paid.

About 15 or 20 minutes later, the defendant Donohoe came into the bar, stood on the other side of Mrs. Hinson, had some conversation with her, became involved in a scuffle with another patron, and finally left. Donohoe had been in the establishment altogether about 10 to 15 minutes. Zoller did not recall seeing him there at any time. Donohoe and Mrs. Hinson knew each other and had been in the Solano Inn earlier that night, at which time she introduced Donohoe as her brother

---

[1] There was in fact no judgment of conviction rendered against Mrs. Hinson. We dispose of the resulting problem *infra*.

Jack. They had been living together for approximately two months at a Vallejo auto court.

When the bar was about to close, Zoller invited Mrs. Hinson to go with him to have something to eat and the two left together for an eating place in South Vallejo which she had suggested. At this point Zoller was somewhat intoxicated. The two of them got into Mrs. Hinson's car, she in the driver's seat and Zoller in the right front seat. According to the testimony of a witness who saw Zoller and Mrs. Hinson get into her car, a white man opened the rear door and got into the car after they did, and just before it pulled away.

After Mrs. Hinson had driven some distance on the way to South Vallejo, Zoller was attacked by someone from the back seat of the car, who threw his arms around Zoller's neck and started to bring it over the front seat, at the same time demanding Zoller's money. The assailant then hit Zoller on the head three or four times with a bottle or other hard object. Zoller lost consciousness. He never saw his attacker at any time.

When Zoller regained consciousness, he found himself out on the road about a quarter of a mile from the place where he had been attacked. He was bleeding and injured. All of his money, except 30 or 32 cents, was gone. He walked to a nearby service station where the attendant called the police. The officers took Zoller to the police station, to a hospital and then back to the police station where Mrs. Hinson had already arrived. During the attack Mrs. Hinson continued driving the car; so far as Zoller could recall she did not join in the attack.

Among the $150 or $160 which Zoller had on his person at the time he entered the Solano Inn was a $50 bill which the bartender saw when Zoller paid for the first drink but for which he could not make change.

The evidence showed that Donohoe and Mrs. Hinson were together at the auto court on Sunday. On Monday, October 24th, they appeared at a Vallejo used car lot where they had attempted to buy a car on credit the week before. They told the salesman that they now had a hundred dollars to apply as a down payment on a Buick, but being informed that they still could not finance the purchase, bought a cheaper car for $69.60. Donohoe paid for it in cash; among the money paid, was a $50 bill.

Three statements were given to the Vallejo police by the defendant Hinson. In the first statement orally made at the

Vallejo police station at 3 a. m. on the morning of the robbery, Mrs. Hinson stated that a Negro had attacked Zoller from the back seat of the car and then robbed him. The assailant had her drive him farther on, and then got out of the car.

On October 26, 1960, three days after the robbery, Mrs. Hinson made a second statement in her own handwriting at the Vallejo police station where she had been brought for questioning. The statement, in substance, related her meeting with Zoller at the bar, his displaying the money, the appearance of Donohoe, and the departure of Zoller and Mrs. Hinson to get something to eat. During the drive, according to the statement, Donohoe jumped up from the back seat, held something at Zoller's head, and demanded Mrs. Hinson's purse and Zoller's wallet. She threw her purse into the back seat but when Zoller failed to turn over his wallet, Donohoe hit him with a bottle, rifled his pockets and pulled him out of the car. Donohoe then had Mrs. Hinson drive him to a restaurant and instructed her to report to the police that the robbery was committed by a Negro.

The third statement was given the next day, October 27, to a Vallejo police officer at the Solano County sheriff's office in Vallejo. It was taken down by a certified shorthand reporter and then transcribed. In this statement Mrs. Hinson repudiated her first statement as being false and admitted that the portion of her second statement which was to the effect that she did not know of Donohoe's plan to rob Zoller, was not the complete truth. Mrs. Hinson repeated substantially the meeting in the bar, the ride and the attack except that she added that when Zoller showed his money at the bar, Donohoe told her that " 'the old man has got a wad . . . Get him in the car and I will get it.' " She also added that during the attack the bottle broke and Donohoe started beating Zoller with his fists until she pleaded with him to stop. She repeated Donohoe's instructions to give a false statement to the police and added details not in the former statements. These latter were to the effect that both defendants went out drinking on Sunday, that Donohoe told her the robbery netted $115 of which he gave her $5.00 to spend and that on Monday they spent $65 of the stolen money for a car.

About a half hour after the statement was completed, Officer Lopez of the Vallejo police who had interrogated Mrs. Hinson, had a conversation at the same office with both of the defendants. During this conversation Lopez told Donohoe that Mrs. Hinson had stated that Donohoe had committed the

robbery with her. When Donohoe denied committing the robbery, the officer asked Mrs. Hinson to relate to Donohoe what she had told Lopez about Donohoe's participation. When Mrs. Hinson began to cry and pleaded with Donohoe to tell the truth, he replied that she would get probation anyhow and questioned "why should we both go up for something like this." Thereupon Donohoe's offer to make a statement to Lopez, if the latter would agree not to prosecute Mrs. Hinson, was refused by Lopez. Donohoe then stated that he would think the matter over and "if I decide to confess to you, I'll ask for you."

Upon the arraignment of both defendants, attorney John Aye was appointed as counsel for both and the case continued one week to plead. On that date, before the defendants entered their pleas, counsel's motion for a dismissal of the information, made on behalf of the defendant Donohoe was denied. Thereupon, counsel made a motion that separate counsel be appointed for each defendant on the ground of conflict of interest between the defendants. It was also denied. Both defendants then entered pleas of not guilty to both counts, the defendant Donohoe admitting all three prior convictions.

Neither defendant took the stand at the trial. Zoller, the victim, was the only witness called by the defense. In his closing argument, the district attorney commented on the failure of both defendants to testify.

The defendants contend here that (1) they were denied their constitutional right to be represented by counsel when the court refused to appoint separate counsel for them; (2) Donohoe's conviction of both robbery and assault constitutes double punishment; and (3) the evidence is insufficient to sustain their conviction. We will discuss the first two contentions. Our decision makes it unnecessary for us to consider the third.

We take up the trial court's appointment of counsel. This occurred on November 21, 1960, when upon the arraignment of the defendants, Mr. Aye was appointed counsel for each. The defendants were then given until November 28, 1960, to plead to the information. On that day after Mr. Aye's motion to dismiss the information, made on behalf of the defendant Donohoe, had been denied, the following took place: "MR. AYE: And also, may it please the Court, I have gone over this transcript very carefully and have gone over the statements given by the defendant, Roberta Grace Hinson, and I would at this time request the Court to appoint sepa-

rate Counsel for each defendant. I feel there will be a definite conflict of interest as between these parties and I appreciate fully what the Court said last week but I feel after examining this matter carefully there is going to be a conflict of interest. THE COURT: That motion is denied too. MR. AYE: I will proceed accordingly but I would reemphasize the matter as at this time. THE COURT: They all want separate trials. MR. AYE: No, your Honor. I am not speaking of separate trials, I am talking about separate Counsel. THE COURT: At the same time there is no reason why one Counsel can't defend them both. They have a right to present their testimony as is given. MR. AYE: I appreciate that, but I want to make that point very clear to the Court that if a conflict arises between these two defendants, I am not going to make a choice between them and I will do the best I can to represent both of them, but if a conflict arises between the two of them, I am going to ask the Court to resolve it and I feel in the preliminary statement that such a conflict is going to arise and I want that matter clearly set forth at this time. THE COURT: What about it, Mr. District Attorney, do you know anything about this case, who is going to prosecute the case? MR. LYNCH: I handled the preliminary on it, Judge. THE COURT: Are you going to prosecute this matter? MR. LYNCH: I believe so. THE COURT: Do you think that such is going to arise, or don't you? MR. LYNCH: Well, I don't know what the defense has in mind, but the People think it was a joint enterprise and we think that the two of them were in on it together. THE COURT: It looks to me like a joint venture. MR. LYNCH: That is precisely the People's point. It was strong armed robbery and—— THE COURT: I am going to deny your motion. MR. AYE: You did already, but I wanted to make my point very clear. THE COURT: All right. Put your matter on and the Court will decide them—or the jury will decide.''

In criminal prosecutions under the laws of this state, the right of the party accused ''to appear and defend, in person and with counsel'' is guaranteed by the Constitution of California (art. I, § 13) and reaffirmed by statute. (Pen. Code, §§ 686, subd. 2; 858, 859, 859a, 987, 1018.) For the defendant unable to employ counsel, such right is preserved inviolate by legislative mandate providing that in such instances ''the court must assign counsel to defend him.'' (Pen. Code, §§ 859, 987.)

Although the failure of a court in a state prosecution to make an appointment of counsel may in some instances also

24

contravene the due process clause of the Fourteenth Amendment of the United States Constitution, we do not find it necessary to reach such a question in the case before us.[2]

The constitutional guaranty of assistance of counsel is not satisfied and the right thereto is impaired, where the court has failed to make an effective appointment of counsel for a defendant who is unable to employ counsel himself.

Such an impairment of this basic right results where one lawyer is required to represent two or more defendants whose interests are conflicting.

In the leading case of *Glasser* v. *United States*, 315 U.S. 60 [62 S.Ct. 457, 86 L.Ed. 680], Glasser and Kretske, two former assistant United States attorneys, were indicted for conspiracy to defraud the United States. Glasser had employed Stewart as his counsel. Upon Kretske's dismissal of his own counsel, the court, with Kretske's and Stewart's approval appointed Stewart to represent Kretske also. During the proceedings leading up to the appointment, Stewart stated to the court that there would be "some little inconsistency in the defense" (p. 90) and also indicated some disapproval on the part of Glasser to the appointment. Glasser himself remained silent. Glasser's conviction was set aside by the Supreme Court because of an ineffective appointment of counsel, the court stating at pages 70 and 71: "Even as we have held that the right to the assistance of counsel is so fundamental that the denial by a state court of a reasonable time to allow the selection of counsel of one's own choosing, and the failure of that court to make an effective appointment of counsel, may so offend our concept of the basic requirements of a fair hearing as to amount to a denial of due process of law contrary to the Fourteenth Amendment, *Powell* v. *Alabama*, 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527], so are we clear that the 'assistance of counsel' guaranteed by the Sixth

---

[2]The right to counsel in criminal cases is guaranteed by the United States Constitution (Amend. VI). Although the Sixth Amendment does not apply to state prosecutions, failure to make an effective or any appointment of counsel in state cases, when tested by an appraisal of the totality of the facts in a given case (*Betts* v. *Brady, infra*) may constitute a denial of due process under the Fourteenth Amendment. (*Powell* v. *Alabama*, 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527].) But the due process clause of the Fourteenth Amendment does not incorporate as such the specific guarantees found in the Sixth Amendment and the concept of due process in the Fourteenth Amendment does not obligate the states, whatever may be their views, to furnish counsel in every case. (*Betts* v. *Brady*, 316 U.S. 455 [62 S.Ct. 1252, 86 L.Ed. 1595]. See generally, Annotations, 2 L.Ed.2d 1644; 93 L.Ed. 137.)

Amendment contemplates that *such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests.* If the right to the assistance of counsel means less than this, a valued constitutional safeguard is substantially impaired. . . . Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused. . . . The trial court should protect the right of an accused to have the assistance of counsel. . . . No such concern on the part of the trial court for the basic rights of Glasser is disclosed by the record before us. The possibility of the inconsistent interests of Glasser and Kretske was brought home to the court, but instead of jealously guarding Glasser's rights, the court may fairly be said to be responsible for creating a situation which resulted in the impairment of those rights.'' (Emphasis added.)

The additional consideration relied upon for reversal that Glasser was entitled to ''the undivided assistance of counsel of his own choice'' (315 U.S. at p. 75) does not weaken or qualify in any way the rationale of the court based on conflict of interest.

In *People* v. *Lanigan*, 22 Cal.2d 569 [140 P.2d 24, 148 A.L.R. 176], Lanigan and Giardano, charged with robbery, were represented by separate counsel at their first trial which resulted in a disagreement of the jury. Lanigan's counsel then withdrew and on the commencement of the second trial, Lanigan appeared without counsel. Over the objection of both defendants and the counsel involved, the court then appointed counsel employed by Giardano to represent Lanigan also. Giardano's counsel suggested to the court that the interests of the defendants might conflict; the court stated that it thought otherwise. Lanigan's request for a continuance until he could secure other counsel was denied.

The convictions of both defendants were reversed. As to Giardano, it was held that he was entitled to the undivided assistance of the counsel whom he had employed. As to Lanigan, it was held that there had been a failure to make an effective appointment of counsel not only because Giardano's counsel did not wish to represent him but also because he felt he could not properly do so. The following language pertinent to the conflicting interests of the defendants is equally pertinent to the case before us: ''In criminal cases it frequently occurs that circumstances which make it advisable for one defendant to testify are not present when consideration is

given to the question of offering another defendant as a witness. One may be vulnerable to impeaching questions and the other not. It might be highly desirable that the one not so vulnerable take the witness stand and the other not. If the former should do so and the other not, the circumstance might weigh heavily against the latter in the minds of the jury. A like prejudice might not occur if the defendants were represented by separate counsel. Each of the defendants was entitled to have questions of this nature considered and decided by counsel independently of the interests of the other. And counsel should not be hampered or embarrassed by being compelled to choose one course as against the other because of the action taken by the court.'' (Pp. 576-577.)

We can find no distinction between the *Glasser* and *Lanigan* cases on the one hand, and the appeal before us on the other, based upon the fact that in the first two cases, counsel was *employed* by one defendant and then *appointed* by the court for the other, whereas in the instant appeal the same counsel was *appointed* for both defendants. The important consideration is that the right of the accused to the assistance of counsel must remain unimpaired. Where the defendant unable to employ counsel objects upon the ground that a conflict of interest exists, it makes no difference whether the counsel appointed has been *employed* by the codefendant or has been *appointed* for the codefendant. In either case, the basic rights of the accused are impaired.

The recent case of *People* v. *Kerfoot,* 184 Cal.App.2d 622 [7 Cal.Rptr. 674], presents the problem of conflicting interests against the background of an attempted appointment of the same counsel for both defendants. Kerfoot and Demes were charged with murder and with assault with a deadly weapon with intent to commit murder. At their first trial, upon their claim that a conflict of interest existed between them, the court appointed private practicing attorneys as separate counsel. After the first trial ended in a disagreement of the jury, the court permitted the withdrawal of such counsel, but without the notice to the defendants required by the statute. (Code Civ. Proc., § 284.) Having heard the testimony at the first trial, the trial judge felt that there was no conflict of interest between the defendants and stated that one attorney could represent both of them. It was indicated that a deputy public defender, one Littlefield, would be available. Demes at first objected upon the grounds that he was entitled to private counsel and, further, that there was a conflict of interest, but,

after the court advised him that it would appoint neither private nor separate counsel, finally accepted Littlefield. Kerfoot objected, and was in turn advised by the court that he must take Littlefield or go without counsel. Kerfoot then accepted. Littlefield was appointed counsel for both. Mr. Littlefield later moved for a continuance of the trial, whereupon first Kerfoot and then Demes moved to dismiss Littlefield, who was ordered discharged. Both defendants proceeded to trial without counsel. They did not have transcripts of the first trial. Neither defendant made any effort to cross-examine any witness, neither called any witness in his own behalf and neither testified in his own behalf. Both defendants were convicted. Both appealed but Kerfoot dismissed his appeal. Demes' conviction was reversed.

The court held that the trial court "not only had the clear authority to appoint separate counsel for Demes, but it was error not to so appoint such counsel" (184 Cal.App.2d at p. 637) and that "had each defendant had a separate attorney each defendant would have been afforded his constitutional rights." (P. 645.)

The foregoing authorities leave us with the conviction that in the case before us the trial court failed to make an effective appointment of counsel for the defendants. We feel that at the very outset, consideration should have been given to the statements of able and diligent counsel who had reviewed the transcript of the preliminary hearing, examined the statements given by Mrs. Hinson to the police and talked to both defendants. Mr. Aye's conclusion is both clear and positive: "I feel there *will be a definite* conflict of interest as between these parties and I appreciate fully what the Court said last week but I feel *after examining this matter carefully* there *is going to be* a conflict of interest" (emphasis added). This amounted to advance notice by counsel that he would probably be hampered or restricted in his representation of the defendants, that he might be placed in a position where he could not advise a course of action for one defendant for fear that it would prejudice the other, and that, as a consequence, he might not render the full assistance to which each defendant was entitled. Insistence upon the appointment of this same counsel for both defendants is therefore not consonant "with solicitude for the essential rights of the accused." (*Glasser* v. *United States*, 315 U.S. at p. 71.) Mr. Aye's suggestion that he would ask the court to resolve any conflict when it arose, offered no remedy for the situation. It was the right to *counsel*

which was guaranteed to each defendant. This existed at every stage of the proceedings, with all the incidental benefits of consultation, preparation for trial and of the full, vigorous and proper use of skillful advocacy.

Mr. Aye's evaluation of the conflict was not without basis. The positions of the defendants were not the same. Their relationship extended beyond the bare scope of the charge. Mrs. Hinson had given three statements to the police; she had no prior convictions. Circumstances might have warranted her taking the stand to explain the facts against her or at least to offer some excuse for her conduct. Donohoe had denied all connection with the offenses, except for a possible admission inferable from his conversation with Officer Lopez. It may have been in his best interests to attack the three separate and different statements of his codefendant and thus her credibility. Separate counsel for each defendant throughout the proceedings might have employed tactics for the best interest of his defendant, including a vigorous assault on the remaining defendant, without having to consider the interest of such other defendant. All weapons in the armory could be used.

One of the most effective of these weapons is the summation of the defense in oral argument. Although the oral arguments of counsel are not in the record before us, we think that it is a fair assumption that the argument of defense counsel must of necessity have been restricted in its scope and in places restrained in its tone by an ever present concern that his comments on behalf of one defendant did not injure or offend the other. Such a position for counsel necessarily implies the possible relinquishment of points of argument, even though they might have benefited one of the accused. The difficult situation in which both of the accused and their counsel found themselves in this proceeding, is pointed up by the fact that neither defendant took the stand. We wonder whether this circumstance does not indicate an expedient solution for an insoluble problem and, all in all, the taking of an easy way out. If such were the fact, the basic rights of the accused were not protected.

The Attorney General, contending that the single fact of representation of two defendants by one attorney is not a deprivation of the right to counsel, relies upon *People* v. *Hall*, 178 Cal.App.2d 878 [3 Cal.Rptr. 442]; *People* v. *Turney*, 127 Cal.App.2d 258 [273 P.2d 681]; *People* v. *Meacham*, 84 Cal. App.2d 193 [190 P.2d 262]; and *Sanders* v. *United States*,

183 F.2d 748. Such cases are distinguished from the one before us. In each of them, no conflict of interest was suggested and no objection to counsel made until at least after the verdict was returned. *People* v. *Meacham, supra,* was so distinguished in *People* v. *Kerfoot, supra,* 184 Cal.App.2d at page 645. As the court stated in *Kerfoot,* "It is true that if no adverse interest *exists* and *none is claimed,* the representation of more than one defendant by a single attorney is permissible." (Pp. 644-645.) But in the case before us, such adverse interest did exist and was claimed.

The Attorney General contends that any objection to counsel based upon conflicting interests of the defendants must specify "what the purported conflict of interest comprises." We find no such requirement in the cases. In the *Glasser* case, there was but a general allusion to the conflict. (315 U.S. at p. 68.) In the *Lanigan* case, the objection was limited to a statement the interests "might conflict." (22 Cal. 2d at p. 572.) In the *Kerfoot* case, although the judge, prior to the first trial, had felt there was a conflict of interest, he was of a different opinion prior to the second trial. Upon the proceedings with respect to appointment of counsel, hereinabove detailed by us, Demes, the appellant, so far as the opinion discloses, made only a general objection that there was a conflict of interest. (184 Cal.App.2d 626-628. See also *People* v. *Robinson,* 42 Cal.2d 741, 743 [269 P.2d 6], where there was only a suggestion that "there might be a diversity of interest.") In the case before us, Mr. Aye did not confine himself to a bare objection of the possibility of a conflict. He stated that he had carefully gone over the transcript and had examined the statements given by Mrs. Hinson and stated positively that there would be a definite conflict of interest. We feel his objection was sufficient.

The Attorney General next argues that neither defendant entered an objection personally to being represented by Mr. Aye. It was not necessary. No authority has been cited by respondent, nor disclosed by our independent research, imposing such a requirement. Mr. Aye had previously been appointed counsel for both defendants at their arraignment. The objection which he entered was made on their behalf, as well as his own.

Finally, on this phase of the case, it is suggested by the respondent that the defendants were represented by the same counsel when prior to trial they sought prohibition from this court, and are similarly represented on this appeal. This

argument has no merit. If error was committed in the appointment of such counsel, we fail to see how it was dissolved by his continued representation of them, which was his duty, or how it was waived by their acceptance of his service, which they were unable to replace anyhow with counsel of their own choice.

We now consider the question of double punishment which affects the defendant Donohoe alone. He was convicted of both robbery (Pen. Code, § 211) and assault by means of force likely to produce great bodily injury. (Pen. Code, § 245.) For the former offense, the jury fixed the degree as being that of robbery in the first degree. (Pen. Code, §§ 211a, 1157.) Donohoe was sentenced to imprisonment in the state prison for the term prescribed by law, the two terms of imprisonment to run consecutively. He urges that the foregoing conviction constituted double punishment proscribed by section 654 of the Penal Code.[3]

It is clear that both the robbery and the assault involved force. But was the force other than that incident to the accomplishment of the robbery?

Our determination of this question is governed by the criteria set forth in *Neal* v. *State*, 55 Cal.2d 11 [9 Cal. Rptr. 607, 357 P.2d 839] : ''Punishment for two offenses arising from the same act is prohibited by the constitutional and common-law rule against multiple punishment for necessarily included offenses (*People* v. *Kehoe*, 33 Cal.2d 711, 713 [204 P.2d 321]) and by Penal Code, section 654, which provides that 'An act or omission which is made punishable in different ways by different provisions of this code may be punishable under either of such provisions, but in no case can it be punished under more than one.' [Footnote omitted.] . . . Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'' (Pp. 18, 19 of 55 Cal.2d.)

We proceed to apply the foregoing test to the evidence before us: The record shows that Zoller was attacked by someone from the rear seat of the car. The assailant forced Zoller's neck backward over the seat, demanded his money and immediately started hitting Zoller on the head with a

---

[3]On motion for directed verdict, Donohoe made the same contention below on the ground that the evidence showed ''no independent assault.''

bottle or other hard object. Zoller lost consciousness. He was put out of the car and left on the side of the road. He was bleeding and injured. Sufficient circumstantial evidence, other than Mrs. Hinson's statement, exists in the record to connect Donohoe with the incident. The prosecutor apparently offered such statements against Mrs. Hinson and conceded that they were not binding upon Donohoe. It is clear that as extra-judicial statements made out of his presence, they are hearsay as to the defendant Donohoe and not binding on him. Even if considered as evidence offered on a theory of conspiracy, though none was charged in the information (*People* v. *Gardner,* 147 Cal.App.2d 530 [305 P.2d 614]; *People* v. *Rivas,* 92 Cal.App.2d 663 [207 P.2d 1062]), such statements would still be hearsay since they were made by Mrs. Hinson after the commission of the crime and therefore the termination of any conspiracy. (*People* v. *Oldham,* 111 Cal. 648 [44 P. 312]; *People* v. *Gilliland,* 39 Cal.App.2d 250 [103 P.2d 179].) Other than the evidence as to Zoller's physical condition, the record does not show evidence of the additional blows allegedly dealt the victim by Donohoe or in what manner Zoller was put out of the car.

The above record discloses no divisible course of conduct. It is obvious that Donohoe beat his victim in order to get the victim's money. His motive in using force was to compel Zoller to surrender his money. We are unable to extract from the record a separate and distinct objective to commit an assault as such. Donohoe's objective was robbery and the force used was merely incidental to it.

Respondent argues that since Zoller was aged, intoxicated and unable to resist, the evidence that Donohoe hit him several times shows an independent intent to cause great bodily harm. However, mere excessiveness of force used does not establish an independent intent and thus a divisible criminal act. The record before us may show that Donohoe was a cruel robber, but it does not show that his acts were done for any purpose other than obtaining Zoller's money. Even more untenable, therefore, is respondent's suggestion that the attack was motivated by Donohoe's anger or envy induced by Zoller's friendly association with Mrs. Hinson.

We conclude, therefore, that the defendant Donohoe, on this record, can be punished only for the more serious offense which is the robbery. This conclusion, we must emphasize, is based upon the record before us at this time. Upon a retrial of this case, additional evidence may be available to the prose-

cution. Obviously, what we have concluded on this record, will not prevent the introduction on retrial of new or additional evidence which, together with that now before us, may show, or tend to show, that Donohoe's course of conduct was divisible and that he had a separate and distinct objective to commit the assault charged in the second count.

As we have noted above, no judgment of conviction was entered in this case against the defendant Hinson. Her appeal, therefore, from what she describes as "the judgment therein entered . . . against the defendants" is construed by us, as to such defendant only, as an appeal from the order granting probation. (Pen. Code, § 1237; *People* v. *Melton,* 125 Cal.App. 2d Supp. 901, 907 [271 P.2d 962, 46 A.L.R.2d 914].)

The judgment of conviction against the defendant John Richard Donohoe is reversed on both counts. As construed above, the order granting probation to the defendant Roberta Grace Hinson is reversed. The order denying the motion of both defendants for a new trial is reversed.

Bray, P. J., and Tobriner, J., concurred.

A petition for a rehearing was denied February 23, 1962, and respondent's petition for a hearing by the Supreme Court was denied April 3, 1962.